Curtis Lee JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69300.

Court of Criminal Appeals of Texas, En Banc.

Oct. 23, 1985.

Ronald Mock, Benjamin Durant, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Don Clemmer and Wilford Anderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant appeals his conviction for the capital murder of a burglary victim. V.T. C.A. Penal Code, § 19.03. The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071, V.A.C.C.P.. Appellant alleges six grounds of error. The sufficiency of the evidence to support the conviction and punishment is not challenged. We affirm.

In his sixth ground of error, appellant contends that the trial court erred in refusing to grant his motion to suppress evidence lodged against appellant's confession since the confession was not knowingly and intelligently given. Appellant specifically contends that the confession was rendered involuntary because he did not eat or sleep prior to questioning, he has a limited ability to read, and the officers told him that another party to the murder had given a statement.

The record reflects that appellant was arrested as a suspect in an aggravated robbery shortly after midnight on September 30, 1983. He was given his *Miranda*[1] warnings, which he indicated he understood. The officers took him to the scene of the robbery where the victim identified

---

**1.** *Miranda v. Arizona,* 387 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

him as the robber. Appellant was then taken to the Houston Police Department.

Approximately two hours after his arrival, appellant was again informed of his rights. He informed Officer R.E. Casey that he understood his rights and stated "You have me cold so I'm willing to make a statement." Appellant then told the officers that he and Roy Jones went into a U-Totem store, and while he pointed a gun at the attendant, Jones took money from the safe. When he and Jones finished the robbery, they drove away and were followed by Tereso Salazar, who was driving a wrecker truck. After a short chase, they jumped out of the vehicle and hid until the police, assisted by Salazar, found them.

The statement was given at 3:30 a.m., and completed at approximately 4:00 a.m. At no time did appellant request an attorney or state that he wanted to terminate the interview. Moreover, appellant was not induced into giving the statement by promises, threats, or acts of coercion. After the statement was completed, appellant was taken to the jail.

At approximately 7:00 a.m., Detective L.W. Hoffmaster was told that appellant and Jones had been arrested and fit the descriptions of the suspects in the deceased's murder, which had occurred one week earlier. Hoffmaster checked Jones out of jail and took him before a magistrate, who gave Jones the statutory warnings. Jones made a statement and told Hoffmaster that he and appellant had been in the process of burglarizing the deceased's apartment when the deceased and two other men returned. Jones stated that appellant shot the deceased.

After Jones' statement was completed, at approximately 12:30 p.m., September 30, 1983, Hoffmaster checked appellant out of jail and took him before Judge Fad Wilson, who informed appellant that he had been accused of capital murder and gave him the statutory warnings. Appellant told Judge Wilson that he understood the warnings.

At approximately 1:00 p.m., Hoffmaster and Detective H.G. Welsh returned appellant to the homicide office. Hoffmaster testified to the following:

"Q. [By Defense Counsel] And at this particular time, had Curtis Johnson had anything to eat to your knowledge prior to this time?

"A. Well, I wouldn't know. I don't know what he received in the jail. So as far as me giving him anything until then, no. I asked him when we returned, if he wanted a coke or coffee or anything and he said that he wanted a cigarette. So I got him some cigarettes.

"Q. Sir, are you aware of the fact that they don't serve breakfast or that, were you aware of the fact that he didn't get any breakfast over at the city jail that morning?

"A. No, no, I wasn't.

"Q. Do you know what time they serve lunch over at the city jail? Do you have any idea?

"A. No, sir.

"Q. Okay, Do you recall him saying anything to the effect that he hadn't had anything to eat?

"A. No, sir.

"Q. Prior to that time?

"A. No, sir, because if he had, I would have provided him something. I bought Jones a hamburger, potato chips and a coke for lunch, but Curtis, the only thing he asked for was cigarettes and I provided that.

Welsh told appellant that Jones had given his side of the story, and asked appellant if he wanted to give his side. Appellant agreed to give a written statement.

Hoffmaster explained to appellant that he would listen to what appellant said, one or two sentences at a time, type the sentences, and read them back. Appellant then gave his statement.

Substantially, appellant stated that the weekend before, he and Roy Jones went into the deceased's apartment through an open window. They took a camera and $8.00 in cash. As they were preparing to leave, they heard someone coming up the

stairs. When the deceased and his friends entered the apartment through the kitchen door, appellant pointed the pistol at them and told them not to move. The deceased's companions ran out of the apartment, but the deceased fell down on his knees and grabbed appellant by his legs. Appellant kicked him and he fell over backwards, then appellant shot him. Appellant and Jones ran back to appellant's house and "layed [sic] low for a while."

Continuing his statement, appellant said that the night before his arrest, Jones went to his house and the two decided to "make some money." They drove to a U-Totem store and went inside. Appellant pulled a gun on the clerk and told him to go to the front of the store and open the cash register. Jones removed the money. They left the store, got in the car and drove away. They were followed by a man driving a wrecker truck. Jones stopped the car and they both got out and ran. Then, they hid until discovered by the officers.

After the statement was completed, appellant read the warnings at the top of the form and placed his initials beside each to indicate that he understood the rights he was waiving. Appellant never requested to have a lawyer present or that he wanted to terminate the interview. The detectives had appellant read the second paragraph of the statement aloud, which he did slowly. He did not tell them that he could not read, nor did he request their assistance. The detectives believed that appellant could read: he had no difficulty pronouncing the words and did not ask for help.

When appellant testified at the *Jackson v. Denno*[2] hearing, he stated that he stopped attending school when he was twelve or thirteen. Appellant's counsel attempted to demonstrate appellant's limited reading ability by having appellant read aloud the second paragraph of his second confession. Appellant took seven minutes to read the second paragraph of the statement, and was assisted by his attorney.

The trial court filed findings of fact and conclusions of law. He found that appellant was properly given his statutory warnings on several occasions, including the time of his arrest, again at the scene of the robbery, and upon his arrival at the Houston Police Department. Each time appellant received the warnings, he indicated that he understood them. At no time did appellant ask for an attorney or request that the interview be terminated. Appellant did not appear to be under any mental or physical disabilities when the statements were given. There was no evidence that any promises were made to induce appellant into giving the statements, nor was he subjected to threats of force or coercion.

The trial court included the following in its findings of fact:

"Additionally, the Court had the opportunity to observe the witnesses during the time that they testified. The Court noticed that while the [appellant] was testifying and reading paragraph two of State's Exhibit no. 3, that being the confession to the capital murder, the [appellant] would periodically stumble over words of one syllable and had very little trouble reading words of several syllables. This indicated to the Court and the Court concludes that the [appellant] pronounced only the words he thought most advantageous to his position. The Court further observed that each of the police officers who testified had indicated that never was the defendant induced or coerced to confess. In fact, Detective Hoffmaster offered the [appellant] coke and coffee. The [appellant] refused, indicating all he wanted were cigarettes, which Detective Hoffmaster provided. At no time did the [appellant] claim that he was ever hungry or thirsty or want anything in any way that was not provided."

The trial court found that appellant knowingly and intelligently waived his rights and gave his confession voluntarily.

V.A.C.C.P.

---

2. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). See also Art. 38.22,

The judge at the *Jackson v. Denno* hearing is the sole judge of the weight and credibility of the witnesses: he may believe or disbelieve any part of any witness' testimony. *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983), at 72, citing *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr. App.1978) and *Myre v. State*, 545 S.W.2d 820 (Tex.Cr.App.1977). See also *Kelly v. State*, 621 S.W.2d 176 (Tex.Cr.App.1981). The determination of whether a waiver has been knowingly or voluntarily waived must be made on a case by case basis. *Barton v. State*, 605 S.W.2d 605 (Tex.Cr.App.1980) and cases cited therein at 607. See also *McKittrick v. State*, 541 S.W.2d 177 (Tex. Cr.App.1976). We are not at liberty to disturb the trial court's findings of fact if they are supported by the record; if they are so supported, we address only the question of whether the trial court improperly applied the facts to the law. *Faulder v. State*, 611 S.W.2d 630 (Tex.Cr.App.1980), *cert. denied* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980), op. on State's motion for rehearing. See also *Sinegal v. State*, 582 S.W.2d 135 (Tex.Cr.App.1979).

In the case before us, appellant testified that he did not sleep prior to giving the confession. Since he was placed in the jail after arrest, he had the opportunity to sleep, but presumably was unable to do so. Appellant did not testify that the officers prevented him from sleeping or refused his request to sleep before confessing. Also, appellant was offered food but refused and asked only for cigarettes, which were provided.

Lack of sleep or food alone, will not render appellant's confession involuntary. See *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985). Moreover, with regard to appellant's claim of illiteracy, there is ample evidence in the record to support the court's finding that appellant was properly warned, understood his rights, and was capable of reading. Last, with regard to appellant's contentions regarding disclosure of Jones' confession, the detective's

statement that Jones had already given the police a statement did not constitute a promise or threat of force which would render appellant's confession involuntary. Cf. *Roberts v. State*, 545 S.W.2d 157 (Tex. Cr.App.1977). See and cf. *Bush v. State*, 697 S.W.2d 397 (Tex.Cr.App.1985). We find on the facts of this case that the trial court did not err in finding that the confession was given knowingly and voluntarily. Appellant's sixth ground of error is overruled.

In his fifth ground of error, appellant contends that the trial court committed reversible error by encroaching upon appellant's right to cross-examine witnesses. Specifically, appellant contends that the trial court erred by not permitting appellant's counsel to question Detective L.W. Hoffmaster, called by the State, regarding information given to Hoffmaster by a confidential informant.

The record reflects that during a hearing outside of the presence of the jury, appellant's counsel requested permission to ask Hoffmaster whether the information he received from the informant regarding Robert Jackson[3] involved a gun. The State's attorney objected on hearsay and relevancy grounds. The trial court propounded questions to the witness, and the following discussion occurred:

THE COURT: ... When did you get this call, if it was a call?

"A. [Witness] There was a call, a message left for me and I returned the call. I don't know this person who called.

THE COURT: The conversation that you had, within what time frame did it occur? Was it after the fact of the case had been presented to the jury and before this defendant was arrested, or after the defendant was arrested or in what time frame are we talking?

"A. It was a day or two after the murder occurred, before this defendant was arrested. I don't remember exactly.

---

3. See discussion, *infra*.

THE COURT: I understand. I just wanted a ballpark.

"A. Yes, sir.

THE COURT: Next, was the gun conversation about, did they claim to have anything to do with this particular case?

"A. The information was that Robert O'Neal Jackson had been robbing some people in the neighborhood with a gun and that possibly he could be involved in this offense along with his little brother and thought that maybe his little brother might be the other man.

THE COURT: All right, sir. Now, Mr. Durant [appellant's counsel], I want you to once again ask the question and tell me what the question is precisely the way you intend to ask it before the jury if we get that far.

MR. DURANT: Detective Hoffmaster, without going into what was said, did the information received from the confidential informant involve a gun?

"A. Yes.

THE COURT: I will not permit the question to be asked.

MR. DURANT: Note our exception.

THE COURT: Because from what Detective Hoffmaster says, the conversation about the gun did not in any way refer to an alleged gun in this case. It is just a gun. And therefore I don't see the relevancy at all.

In order to be admissible, evidence must be relevant to a contested issue. *Stone v. State,* 574 S.W.2d 85 (Tex.Cr.App. 1978). See also *Johnson v. State,* 651 S.W.2d 434 (Tex.App.Dallas 1983). The determination of whether evidence is relevant to any issue in the case lies within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion. *Williams v. State,* 535 S.W.2d 637 (Tex.Cr.App.1976), and cases cited therein at 640; *Stone,* supra, at 89 and cases cited therein.

The meaning of the term "relevancy" was discussed in *Plante v. State,* 692 S.W.2d 487 (Tex.Cr.App.1985) at 491, quoting from *Waldrop v. State,* 138 Tex.Cr.R. 166, 133 S.W.2d 969 (Tex.Cr.App.1940):

"Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable."

The opinion in *Plante,* supra, also indicated that "relevant evidence" means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Id.* at 491, fn. 6.

In the case before us, the evidence regarding the informant's mention of a gun was not relevant. Initially, there were no contested issues regarding the gun. In his confession, appellant admitted that the pistol recovered when he was apprehended by the police was the same as that used in the murder. Thus, the evidence could not be relevant to a contested issue. Also, the evidence did not have a tendency to make the determination of the identity of the perpetrator more or less likely since the gun was not connected in any way to the murder. The trial court did not abuse its discretion in finding the proffered evidence inadmissible. Appellant's fifth ground of error is overruled.

In his first ground of error, appellant contends that the trial court erred by discharging on its own motion prospective juror Elizabeth Kuhlman. During the State's voir dire examination, the following discussion occurred:

"Q. [By State's attorney] Well, I'm asking you if you can base your decision, could you return a verdict of guilty if the—

"A. On just a written statement?

"Q. All right. Would that be true in all capital murder cases that you would be called upon to serve as a juror?

"A. I think so, yes.

"Q. Would that be true regardless of what the fact situation, the type of

capital murder case would be, is that true, would that be solely upon a written confession of a defendant in all capital murder cases?

"A. Yes.

"Q. And would that be regardless of what type of case, capital murder case it is?

"A. Yes.

MR. ANDERSON [State's attorney] *Your Honor, the State would*— [emphasis in appellant's brief].

THE COURT: Before you do that, let me ask a question . . . .

The trial court posed several questions to the prospective juror and then allowed appellant's counsel to question her. After appellant's counsel finished with his examination, the following discussion occurred:

THE COURT: Anything else, Mr. Mock [appellant's counsel]?

MR. MOCK: That will do it, judge.

THE COURT: Pardon?

MR. MOCK: That will do it.

MR. ANDERSON: Thank you, Your Honor.

THE COURT: Mrs. Kuhlman, your jury service has been concluded. We appreciate very much your being with us. You need not worry about going back to that Central Jury Room where you were this morning. You're free to go home or wherever it is you need to go.

If you need an excuse or a permit for any reason, Ms. Trammell over here has that for you. We very much appreciate your being with us today and your check for your jury service will be mailed to you at the same address that your summons was.

Appellant does not contest the trial court's decision to excuse the prospective juror; rather, appellant objects to the court's exclusion of the juror sua sponte. He states in his brief:

"One could possibly conclude that if the prosecutor had finished what he was about to say his complete statement would have been, 'Your Honor, the State would challenge this prospective juror for cause.' However, this would be reading something into the record which does not appear therein."

Appellant concludes that reversal of the case is required.

Assuming arguendo that the exclusion of the prospective juror was improper, appellant has not preserved error on this issue since he voiced no objection to the court's actions at the time the juror was excused. Generally, counsel must object at trial in order to preserve error on appeal. *Haynes v. State,* 627 S.W.2d 710 (Tex.Cr.App.1982); *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr. App.1979); *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978); *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978); *Thompson v. State,* 537 S.W.2d 732 (Tex.Cr.App.1976). Even in capital murder cases, the failure to object to the improper exclusion of veniremembers waives error and such exclusion cannot be considered on appeal. *Duff-Smith v. State,* 685 S.W.2d 26 (Tex.Cr.App. 1985); *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.App.1980); *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979), *cert. denied* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1136 (1980), and cases cited 583 S.W.2d at 395. See also *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978), *cert. denied* 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1978), *rehearing denied* 444 U.S. 888, 100 S.Ct. 190, 62 L.Ed.2d 123 (1979).

This doctrine of waiver without objection has been applied to a situation similar to the case at bar in *Hawkins v. State,* 628 S.W.2d 71 (Tex.Cr.App.1982). In *Hawkins,* we held that the defendant's failure to object to the trial court's sua sponte excusal preserved nothing for review. Accordingly, we find that in the present case, appellant's failure to object waived error. Appellant's first ground of error is overruled.

In his second ground of error, appellant contends that the trial court improperly granted the State's challenge for cause directed at prospective juror Harry Robinson, who had been thoroughly rehabilitated. During the State's voir dire examina-

tion of Robinson, the following discussion occurred:

"Q. And again, in response to the questions that the Judge gave to you, under no circumstance would you violate your oath as a Pentecost, as a religious person and the teachings that you have as a Pentecost, could you violate that belief by voting in such a way that the judge would assess the death penalty to an individual that you've been called upon to pass judgment.

"A. Right.

"Q. Is that a fair statement?

"A. Right.

"Q. And again, we don't want you to think that your responses and the way that you feel is wrong. All right? Because there are very many good people who totally believe that the death penalty is not a proper punishment and there are many, very many good people who believe that in the proper case, that the death penalty is a proper punishment. But again only you as an individual know what your true feelings were.

And just based upon what I think you've already informed the Court, that you would have to stick with your religious beliefs?

"A. Right.

"Q. And under all circumstances, if you're called upon, that you would vote in such a way that the defendant in a death penalty case would not be assessed the death penalty?

"A. Right.

"Q. Is that right?

"A. Right.

"MR. ANDERSON: I'll just pass him for the time being.

"THE COURT: Mr. Durant, do you really have any questions?

"MR. DURANT: Yes, sir. I do.

"THE COURT: As to that issue only.

"MR. DURANT: Sir?

"THE COURT: As to that issue only.

"MR. DURANT: Yes, sir.

VOIR DIRE EXAMINATION BY MR. DURANT

"Q. Now, Mr. Robinson, let me try to explain a couple of things to you now. People who sit on the jury don't give the death penalty. Okay?

"A. All right.

"Q. It used to be that way in Texas, but it's not that way anymore. You used to sign something that said, "We assess the defendant death," but it's not done that way anymore.

I want you to look at these two questions because this is really what it boils down to. Now, you're not being brought in here today to decide whether or not somebody is going to be given the death penalty, because if you listen to the evidence and you find out a person is not guilty, then you would return a verdict of not guilty. Is that correct?

"A. Right.

"Q. Okay. Let me ask you this. Can you listen to the evidence in a case and return a verdict that's appropriate based on the evidence that you hear?

Okay. Let me break that down for you. In other words, if you listen to the evidence and you're convinced beyond a reasonable doubt that a person is guilty, do you have the courage to find them guilty if you're convinced beyond a reasonable doubt that a person is guilty?

"A. Yes.

"Q. And by the same token, if you look at it on the other side of the coin, if you're not convinced beyond a reasonable doubt that a person is guilty, do you have the courage to find them not guilty?

"A. Yes.

. . . . .

"Q. [By Mr. Durant] All right. Mr. Robinson, would you be able under the appropriate circumstances, would you be able to answer this question yes under the appropriate circumstances, question number one?

"A. With all the evidence presented to me and I saw that the person, whatever, Your Honor, was found guilty, I could answer that with yes, with all the evidence showing that he was.

"Q. All right. With evidence showing it. All right. Now, thank you, sir.

. . . . .

"Q. So what you're saying is you will answer these questions truthfully if it required a yes answer, the Judge would assess the death penalty. Do you understand what I'm saying?

You see, the jury doesn't assess the death penalty. What you do is answer these questions.

Now, would you fail, can you follow your oath as a juror and based on the evidence answer question number one and question number two truthfully as based on the evidence?

"A. Yes, I could.

"MR. DURANT: That's all we have, Judge.

"THE COURT: Mr. Robinson, one thing that you have not yet been told and I just, this is something that all the prospective jurors are being told. The law says that these questions that have been talked to you about as well as a third one, which may be given to you at the conclusion of the trial, it's not for certain but it might, if the jury answers all of the questions submitted yes, I have no choice and I have no option; the law says I must sentence the defendant to death. If the jury answers any of the questions no or all of them no, again I have no choice, I have no option; I must sentence the defendant to life.

So while as Mr. Durant says, as a juror, you won't go back and directly say, I want to vote for the death penalty, I want to vote for the life sentence, you will not be doing that, but you, as well as all of the other jurors, are entitled to know what the effect of your answers will be. And the effect will be that if all of the questions are answered yes, I'm going to sentence the defendant to death. If one or more of them is answered no, I'm going to sentence the defendant to life.

Now, Mr. Durant has asked and you have answered, he has asked if you would base your answer on the evidence to these questions and you have indicated, yes, you would. You had also indicated that under no set of circumstances or no facts could you ever vote in such a way that the death penalty would be assessed because of your religious training and belief. Is that correct?

"THE JUROR: Right.

"THE COURT: So the question that I have for you now, Mr. Robinson, is, if you believed from the evidence that the questions should be answered yes, would you answer those questions yes even though you knew that your yes answers would require me to sentence the defendant to death?

THE JUROR: No, because to my understanding of what I was taught, if you had anything to do with it, it was wrong.

"THE COURT: I'm sorry.

"THE JUROR: It was wrong if I had anything to do with—

"THE COURT: The death penalty?

"THE JUROR: —the assessment of death.

"THE COURT: Okay. So if I understand correctly, are you saying then that no matter what the evidence was, whatever it might be, and we could just sit around and dream up circumstances, whatever it might be, at the conclusion of the evidence, when you got around to answering these questions, would you always vote in such a way that the death penalty, excuse me, would you always vote in such a way that a no answer would be given so that you would not be participating in the death penalty?

"THE JUROR: To hold myself with a clear mind with my religion, I would have to.

"THE COURT: All right, sir. So if I understand correctly, no matter what the facts were as to question number one, no matter what the facts were as to question number two, if question number three was given you, no matter what the facts were as to question number three, are you saying that no matter what those facts were, you would always vote in such a way that a no answer would be given to at least one of those questions so that the death penalty would not be imposed?

"THE JUROR: Yes, that's correct, because like I say, you know, to my understanding of my religion, if it has to do with me, I shouldn't be the judge of a life of another.

"THE COURT: And are you firm in that conviction?

"THE JUROR: Right. That's what I really believe.

"MR. ANDERSON: Your Honor, I would respectfully move that because, in light of Mr. Robinson's answer to not only our questions but to the Court's questions, that he be excused as a juror for cause because of his religious beliefs.

"MR. DURANT: Excuse me, Your Honor. May I have one more opportunity, Your Honor?

"MR. ANDERSON: He's passed the juror, Your Honor.

"THE COURT: Tell me specifically what you want to get into, Mr. Durant.

"MR. DURANT: Well, Your Honor, do you want me to approach the bench?

"THE COURT: Surely. You don't care if this is off the record, do you?

"MR. DURANT: No.

(WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD AND PROCEEDINGS CONTINUED ON THE RECORD.)

FURTHER VOIR DIRE EXAMINATION

"Q. [By Mr. Durant] All right, Mr. Robinson. If you can recall, I asked you, can you truthfully answer these two questions.

"A. Right.

"Q. Now, suppose the truthful answer to this question should be yes. Can you vote yes if that's the truthful answer?

"A. No, not with the understanding that this would oppose, I mean, sentence the death penalty. Knowing that, I couldn't rightfully do it.

"Q. So, in other words, what you're saying is even though you knew in your own mind that the answer should be yes, you would violate your oath as a juror and vote no. That's what you're saying?

"THE COURT: Well, I don't think he's saying that at all, Mr. Durant. I think he's apprising everybody to what his religious convictions are.

"MR. DURANT: I understand.

"Q. [By Mr. Durant] But what I'm saying is, you would not, if the answer should be yes, you would automatically simply not vote yes. Is that what you're saying? And vote no?

"A. I would have to vote no to have myself feel, make myself feel right, knowing that if I answered it yes, it would, you know, the possibility of me, leaving it up to me to determine the death penalty or not.

"Q. Well, but that's what I'm saying, Mr. Robinson. It's not up to you. We're simply talking about the questions.

"A. Right.

"Q. And what I'm basically asking you and you're saying what you would have to do, and I'm saying what would you do.

"A. I would have to vote no, because even though the evidence would be presented yes, if I answer yes to this question and it would result in death to a human, I couldn't rightfully say yes. I couldn't say anything, because it's not left up to me to judge life or death.

"THE COURT: All right, Mr. Robinson. Thank you very much. Thank you,

Mr. Durant. The State's motion is granted.

The voir dire examination in this case is very similar to the testimony developed in *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr. App.1985). In *Brandley*, the prosecutor explained the punishment phase of a capital murder trial and the prospective juror, somewhat equivocally, stated that she had a very strong opinion against the death penalty. She indicated that there were no facts under which she could answer the first two punishment questions "yes" because it would result in the death penalty. During his examination, the defendant's attorney reiterated the punishment procedure and stressed that the judge, and not the jury, assesses the death penalty if the jury answers the special issues affirmatively. The prospective juror then indicated that in a proper case she could follow the law and answer the questions "yes." On re-examination, the prosecutor explained that the judge *must* assess the death penalty if the jury answers the special issues "yes." The prospective juror reverted to her original stance and stated that she could never answer the questions in a way that would result in the death penalty. This Court held that the judge did not err under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) or *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) since, once she understood the procedures, the prospective juror did not equivocate from her position that she could not answer "yes" to the special issues.

In the case at bar, the initial examination by the prosecutor revealed that prospective juror Robinson had deep seated religious beliefs against imposition of the death penalty. He also stated that he could not vote in such a way that the death penalty resulted regardless of the facts. When appellant's counsel explained that the judge, and not the jury, actually assessed the death penalty, Robinson indicated that he could answer the special issues in the affirmative. The trial court then explained that he would be required by law to assess the death penalty if the jurors answered the

questions "yes." With that understanding, Robinson stated without equivocation that he would not vote "yes" if it meant that the death penalty would be imposed. He stated that he would automatically vote "no" so as to avoid imposition of the death penalty.

■ On the facts of this case, we find that the trial court did not err in excluding the prospective juror. Once he understood the procedures, Robinson did not equivocate in his unwillingness to assess the death penalty by answering the questions in the affirmative. Moreover, regardless of any temporary apparent rehabilitation, we defer to the judgment of the trial court, who was in a position to gauge Robinson's demeanor and sincerity. See *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985) at 424 and cases cited therein. No error is shown. See also *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). Appellant's second ground of error is overruled.

In his third ground of error, appellant contends that the trial court erred in denying appellant's counsel the right to present proper summation of the evidence to the jury. During appellant's counsel's final arguments during the penalty stage of trial, the following occurred:

"Issue number two, probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. I ask you to look real far. It asks you to say never, because if you answer that question yes, you say never, because he's going to die. He's going to die. But you see, you look at the future and but for a happenstance and a brave Mr. Salazar [the driver of the wrecker truck who followed appellant after the robbery], Robert O'Neil [sic] Jackson would be sitting right here in this chair today and the State would be asking you to kill him too.

MR. HOLLEMAN: Judge, I object to that as being certainly outside of the record.

THE COURT: Sustained."

Appellant contends that his counsel's statements were intended to inform the jury that simply because the State sought the death penalty did not imply that a "yes" response to the second special issue was mandated. According to appellant, as stated in his brief:

"To illustrate the soundness of his proposition, counsel reminded the jury that if prosecution against Robert O'Neal Jackson had not been dismissed, he very well could be in the Appellant's position with the State asking for the penalty of death. This would have been the case eventhough [sic], with respect to this case, Jackson had done no wrong."

The record reflects that shortly after the murder, Officer T.J. McNamara was dispatched to the scene of the crime. After speaking with the deceased's companions, he obtained a description of the suspects. Based upon the description, Officer K.M. O'Brien apprehended Robert O'Neal Jackson, who matched the description and was found walking in the vicinity of the deceased's apartment. Jackson was taken to the scene, where one of the deceased's companions mistakenly identified him as one of the burglars. The witness explained at trial that at the time of the misidentification, he was extremely distraught and exhausted. At the time of the misidentification, Jackson was wearing a read bandana similar to that worn by appellant at the time of the murder, and had similar physical characteristics. There is no evidence in the record regarding how or when charges against Jackson were dismissed, nor whether he was even charged with capital murder.

 Certainly an improper denial of jury argument may constitute a denial of the right to counsel. *Riles v. State*, 595 S.W.2d 858 (Tex.Cr.App.1980) at 861 citing *Spangler v. State*, 42 Tex.Cr.R. 233, 61 S.W. 314 (Tex.Cr.App.1900). Attorneys for both the State and the defense, however, must confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is improper. *Fuentes v. State*, 664 S.W.2d

333 (Tex.Cr.App.1984). *Irving v. State*, 573 S.W.2d 5 (Tex.Cr.App.1978).

 Since there was no evidence in the record to support an inference that Jackson would be on trial for capital murder, the trial court properly sustained the State's objection. No error is shown. Appellant's third ground of error is overruled.

In his fourth ground of error, appellant contends that the trial court erred by permitting the State's attorney to make improper jury argument. During closing remarks at the guilt/innocence phase of trial, the State's attorney made the following statement:

"But if you follow your oath as jurors, if you listen to the evidence, use your common sense, and if you follow the law, there isn't but one decision you can make and that is on September 24, 1983, while in the course of committing burglary or attempting to commit burglary of a habitation of Murray Dale Sweat, Curtis Lee Johnson caused the death, intentionally caused the death of Murray Dale Sweat, hereafter called the complainant, by shooting him with a gun."

Appellant's counsel made no objection to the argument he now contends was improper. Appellant also objects for the first time to the following remarks made by the State's attorney during closing arguments in the punishment phase of trial:

"I just don't see, ladies and gentlemen, if you're true to yourself and true to your oath that there's any way that this issue number two can be answered any other way than yes."

Appellant contends that he did not need to object since these statements were so prejudicial that an instruction to disregard them would not have cured the harm.

 The arguments made by the prosecutor were proper deductions from the evidence and pleas for law enforcement: no improper reference to matters outside of the record was made. See *Phillips v. State* (Tex.Cr.App. No. 69,064, delivered October 16, 1985); *Cannon v. State*, 668 S.W.2d 401 (Tex.Cr.App.1984); *Denison*

*v. State,* 651 S.W.2d 754 (Tex.Cr.App.1983). Even if the remarks had been improper, they were not so highly prejudicial that they could not be cured by an instruction; thus, appellant waived any error in their admission by failing to object at trial. See *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982).

Appellant also objects to the trial court's treatment of the following remarks made during the closing arguments in the punishment phase of trial:

[PROSECUTOR]: "We get to the third issue then. If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. And the court asked you that you have to answer the question of, was killing Murray Dale Sweat, the deceased, unreasonable in response to provocation, if any, by the deceased.

I'm going to ask you to answer that question, 'We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is yes.'

Now, why? Well, first of all, the question asks you to determine, is there any provocation by the deceased. Now, if, I personally don't think there is—"

MR. MOCK: Objection, Your Honor. The prosecutor's opinion.

THE COURT: Sustained. [To the jury] Don't consider the last comment of the prosecutor.

■ It is improper for a prosecutor to inject personal opinion in statements to the jury. *Boyd v. State,* 643 S.W.2d 700 (Tex. Cr.App.1983), at 706 citing *McKenzie v. State,* 617 S.W.2d 211 (Tex.Cr.App.1981) and *Romo v. State,* 593 S.W.2d 690 (Tex. Cr.App.1980). See also *Menefee v. State,* 614 S.W.2d 167 (Tex.Cr.App.1981); *Clayton v. State,* 502 S.W.2d 755 (Tex.Cr.App. 1973); *Robillard v. State,* 641 S.W.2d 910 (Tex.Cr.App.1982).

■ In the case before us, the prosecutor's uncompleted statements implied that he did not believe there to be sufficient evidence to support an affirmative response to the third issue. Thus, the prosecutor approached the error committed in *Boyd,* supra: he affected a special expertise above that of the jury about a contested factual matter. The implication of special expertise coupled with an implied appeal to the jury to rely on that expertise in deciding the contested issues before it is improper. Cf. *McKay v. State* (Tex.Cr.App. No. 69,049, delivered October 2, 1985); and *Smith v. State,* 650 S.W.2d 446 (Tex.App.— Houston [14th] 1982), *cert. denied,* 461 U.S. 935, 103 S.Ct. 2102, 77 L.Ed.2d 309 (1983).

■ Even though the argument was improper, however, we find that the trial court's *prompt* instructions to disregard were sufficient to cure any harm inuring to appellant. Generally, any harm from an improper statement in a jury argument is remedied when the court instructs the jury to disregard unless the remark is so inflammatory that the prejudicial effect cannot be removed by an admonishment. *McKay,* supra, slip. op. at 23, citing *Brown v. State,* 692 S.W.2d 497 (Tex.Cr.App.1985) at 502 citing *Blansett v. State,* 556 S.W.2d 322 (Tex. Cr.App.1977). See also *Ramos v. State,* 419 S.W.2d 359 (Tex.Cr.App.1967); *Van Skike v. State,* 388 S.W.2d 716 (Tex.Cr.App.1965); *Johns v. State,* 157 Tex.Cr.R. 401, 249 S.W. 2d 61 (Tex.Cr.App.1952); *Vineyard v. State,* 96 Tex.Cr.R. 401, 257 S.W. 548 (Tex.Cr. App.1922). The statements in the case before us were not so inflammatory that the trial court's instructions to disregard could not cure any harm. Appellant's fourth ground of error is overruled.

The judgment of the trial court is affirmed.