**Affirmed and Opinion Filed April 17, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-12-01568-CR
No. 05-12-01569-CR
No. 05-12-01570-CR
No. 05-12-01571-CR

**CHRISTOPHER JOEL GRAHAM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 296-80003-2012, 296-80004-2012,**
**296-80005-2012, and 296-296-80006-2012**

## MEMORANDUM OPINION

Before Justices Moseley, Francis, and Lang
Opinion by Justice Francis

A jury convicted Christopher Joel Graham of arson of a habitation, unauthorized use of a motor vehicle, burglary of a habitation, and manslaughter and assessed sentences of seventy-five years in prison each for arson and manslaughter, twenty years for burglary, and two years in state jail for UUMV. The sentences run concurrently. In three issues, appellant challenges the legal sufficiency of the evidence to support the manslaughter conviction and the trial court's refusal to grant a mistrial. We affirm.

At the time of his death, fifty-year-old Stephen Cummins had been living with his parents in McKinney. Stephen had struggled with drug addiction for decades and, while he had spent many years drug free, had relapsed and was using methamphetamine. In October 2011, his

parents went to an out-of-state conference, and Stephen was to take care of their dog and the house. When they returned home three days later, Stephen was dead from a methamphetamine overdose; their van was missing; jewelry, silver, and electronics were gone; and their house and remaining possessions had been damaged in a fire.

Evidence showed that after his parents left town, Stephen went to Dallas and invited four other methamphetamine users—appellant, appellant's then-girlfriend Smokey-Dawn Smith, Ray Watkins, and Linda Rodriguez—to his parents' house to party. Both Smith and Rodriguez testified for the prosecution at trial. According to Smith, Watkins was a "talented" methamphetamine cook and brought his portable meth lab, which he kept in a rolling suitcase. Smith said Watkins and Rodriguez cooked a batch of meth over a period of eight to nine hours. By the next afternoon, the group had used all the meth, and Stephen left and returned with a "clearer" meth, "ice," not the red phosphorus type made by Watkins. Watkins and Rodriguez then left to get materials to cook another batch of drugs, leaving Stephen, Smith, and appellant at the house.

Smith said she and appellant were in the living room when Stephen came out of his bedroom and asked her to "help him do a bump." She said Stephen's syringe had about 70 units of the "clearer" meth, which was a "pretty large bump." In the past when she partied with Stephen, he took a 30 dose. Smith declined, saying she did not even inject herself, and told him to ask appellant. Appellant agreed to help Stephen, and the two went to Stephen's bedroom. Smith said it "took an awful long time," estimating Stephen and appellant were in the bedroom for about forty-five minutes. When appellant returned to the living room, she and appellant went to a spare bedroom. As they passed Stephen's room, the door was open and Stephen was on his knees at the end of the bed, bent over, naked, with his head on top of his arms. Smith thought it

was "kind of weird" but said she had heard of people taking off their clothes after "doing a bump" because they were hot. Appellant also saw Stephen and asked her, "Did you see that?"

After about thirty to forty-five minutes, appellant went to check on Stephen. Smith could hear him in the next room patting Stephen's back and telling him to "get up, get up, get up." Appellant then yelled for her. Smith was experienced in checking vital signs and said she examined Stephen's neck and arm but could not find a pulse. She said his body was "cold and stiff." Smith poured a cup of ice water on Stephen, but did not get a response. Realizing he was dead, she and appellant tried to contact Watkins and Rodriguez. Neither discussed calling 911. A text message sent to Watkins at 5:44 p.m. stated, "bro, I thank [sic] Steve is 86." Smith said appellant sent the text. Watkins and Rodriguez then drove up, and "[a]ll hell broke loose." Smith said Rodriguez was "crying" and "hysterical" because she and Stephen "were really close." Smith said Watkins was "surprised" and "kind of angry," and appellant was "calm."

According to Smith, they needed to get Rodriguez out of there because she was so upset, so they got into the Cummins's van and took Rodriguez to Dallas. Before leaving, they covered Stephen's body with a robe. After taking Rodriguez home, they planned to go back to McKinney to "finish the cook," clean the house, leave, and then call police from a pay phone. Instead, they returned to McKinney, Watkins did a six-hour cook, and she and appellant went through the Cummins's house "looking for valuables" and "ended up taking anything" they could find "worth money," mostly silver, jewelry, and electronics. Smith said they spent hours loading whatever "could fit" into the Cummins's van.

That morning, before leaving, appellant told Smith their DNA and fingerprints were "all over the house" and said he was going to "burn down the house." Smith suggested appellant tell Watkins of his plan. At the time, Watkins was outside working on his car because it would not start. Watkins did not want appellant to start a fire, but appellant told him it was too late, he

–3–

"already did it."  When they tried to leave, the Cummins's van would not start because the van doors were left open overnight and the battery was dead.  Smith said they pushed the van and Watkins's car down the street, and appellant knocked on doors of the nearby homes until he found someone to jump-start Watkins's car.  Once the car started, they jump-started the van and headed back to Dallas.  They did not call the police.

Smith and appellant sold some of the property they took from the Cummins home at pawn shops and to acquaintances.  They continued to drive the Cummins's van until their arrest about two weeks later.  After her arrest, Smith gave the police a voluntary statement.  At the time of trial, she had pleaded guilty to burglary of a habitation but had not been sentenced.

Rodriguez testified she and Stephen were friends and did methamphetamine together.  Stephen usually injected himself, but would sometimes ask for help.  His normal dose was 20 or 30 units; 60 units was a "big dose" in the meth community.

Similar to Smith's testimony, she said Watkins cooked methamphetamine, and the group partied for a couple of days.  At one point, Stephen left and returned with methamphetamine that was different than what Watkins cooked.  When they ran out of drugs, she and Watkins left to get more supplies to cook another batch.  As she was leaving, Stephen was sitting on the bed and was "okay" and "healthy."

Rodriguez and Watkins were gone for no longer than an hour.  On their way home, they starting getting calls and texts from appellant.  They did not answer because they were just down the street.  When they pulled into the garage, Smith and appellant ran outside and told them Stephen was dead.  Rodriguez said she ran into Stephen's room and found him naked, on his knees, with his arms out and his face on the bed.  She checked for a pulse but could not find one and noticed Stephen was "turning gray" and was "real cold."  Rodriguez said appellant told her he gave Stephen "his shot," and Stephen was fine.  Appellant said he left the room, and when he

–4–

returned fifteen minutes later, Stephen was dead. Appellant told Rodriguez the injection was either 60 or 70 units.

Rodriguez was upset and asked to be taken home. Before they left, she saw appellant and Smith "going through things" in the guest bedroom. She and Watkins both told them not to touch the Cummins's "things." Rodriguez acknowledged she had previous arrests for prostitution, drug possession, public intoxication, assault, "[a]ll kinds of stuff." She said it was common in the drug culture for people to have criminal records.

A neighbor of the Cumminses testified that at about 6 a.m. on October 26, 2011, a "scruffy-looking" man showed up at his door needing help getting his car started. The neighbor jump-started the car and then saw the man jump-start a maroon-colored van. The neighbor said the man had two younger people with him.

Another neighbor testified he saw smoke and flames at the Cummins's house at about 6 a.m. and called 911. The fire department responded with four engines but had to call for more. During a search of the house, firemen found Stephen's naked body partially slumped over a bed, draped in a robe. The medical examiner said Stephen's body was not burned and there was no evidence of smoke inhalation. She determined Stephen died of the toxic effects of methamphetamine.

Detective Paul Hardin of the McKinney Police Department led the investigation. When he arrived at the scene, he learned a body was found in the house and a maroon van was missing. Syringes, a spoon, and a belt were found near the body, indicating drug involvement. About two weeks later, through investigation, he was able to locate the missing van outside a motel in Dallas. He put the motel room under surveillance. When a man and woman drove off in the van, the police made a stop and identified the occupants as appellant and Smith. Some of the Cummins's property was found in the motel room.

Smith agreed to talk to Detective Hardin and gave a voluntary statement regarding the events surrounding Stephen's death and the house burning. In addition, he also talked to a former girlfriend of appellant's, Kelly Warren Hunt, who told him appellant came to her apartment after the incident, told her what had happened, and gave her some of the stolen property to keep at her apartment. At the time, Hunt was jailed in Midland County. Hardin obtained a search warrant and found pieces of jewelry and a wooden box belonging to the Cumminses at Hunt's apartment. Detective Hardin also obtained phone records of appellant, Smith, and Watkins and discovered the text message that said Steve was "86." Detective Hardin explained that "86" was slang for meaning "out of here, trashed, done with, gone."

Hunt also testified at trial for the prosecution and gave a detailed account of appellant's visit to her apartment after Stephen's death. She said she and appellant had a prior relationship and did drugs together. She described appellant as "very smart," "very suave," and extremely controlling. In October 2011, appellant came to her home after midnight driving a burgundy-colored van loaded with "[a] lot of merchandise." He brought jewelry, coins, china, and silver into her apartment and told her, "Bitch, I hit the lick of all licks." She explained that "hit a lick" means steal property.

Appellant said he got the merchandise from "some people's house in McKinney" the night before. He was there with Smith, Watkins, and either Watkins's girlfriend or wife. Appellant said they went there to "cook some dope" and "try to hit a lick." When he walked in the house, all he saw were "dollar signs." He said "Steve," who he did not otherwise identify, watched every move they made, so he had to wait. At one point, Steve asked for appellant's help in injecting methamphetamine. Appellant agreed and said he "was going to try and knock him for a loop." After appellant gave him the injection, Steve was okay. Appellant told her "they" stayed with Steve for thirty minutes and left the room when he became "lethargic." Appellant

–6–

told her he did not mean to kill Steve; he did not mean for Steve to die. He intended only to "knock him out for a few minutes." Appellant told Hunt they found Steve naked in the "praying position" on the side of the bed. He had Smith check his pulse. After they realized Steve was dead, appellant said they decided to "[t]ake everything." He also told her that he and Smith put candles on some sheets and lit the house on fire. When they tried to leave, the van would not start, so they pushed it down the street because the "fire truck was coming already." Hunt did not know how they eventually started the van, but she said it "was running when they came to my house in it." Appellant stayed at her apartment for several hours that night. The next day, he picked her up and took her to the motel where he and Smith were staying. She saw silver and computers in the room.

Hunt later learned from news reports what had happened and that "Steve" was Steve Cummins, an acquaintance. After her arrest on unrelated drug charges in January 2012, Hunt contacted Detective Hardin, repeated the story appellant told to her, and said she had some of the property at her apartment. She agreed that a "60 bump" was "a lot." Hunt also acknowledged having a criminal record, having prior convictions for robbery, theft by check, and forgery.

In his third issue, appellant contends the evidence is legally insufficient to support his conviction for manslaughter. Specifically, he asserts both Smith and Rodriguez were accomplices, and there is insufficient evidence to corroborate their testimony. Once the accomplices' testimony is eliminated from consideration, he asserts no competent evidence remains connecting him with Steven's death.

The indictment alleged appellant recklessly caused Stephen's death by (1) injecting Stephen with methamphetamine or (2) assisting Stephen in injecting himself with methamphetamine. A person commits manslaughter if he recklessly causes the death of an individual. TEX. PENAL CODE ANN. § 19.04(a) (West 2011). A person acts recklessly with

–7–

respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *See* TEX. PENAL CODE ANN. § 6.03(c) (West 2011). Further, the risk must be of such a nature and degree that its disregard constitutes gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint. *Id.*

The accomplice-witness rule provides that a conviction cannot stand on accomplice testimony unless it is corroborated by other evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). In making our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense alleged in the indictment. *Id.* It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Appellant argues Smith and Rodriguez are accomplices to manslaughter and, without their testimony, "no legally sufficient evidence on record suggests [he] actually assisted [Steve] with the injection." Assuming without deciding that both Smith and Rodriguez are accomplices to manslaughter, Hunt's testimony was sufficient corroboration and tended to connect appellant to the manslaughter of Steven.

Hunt testified at length as to what appellant told her when he came to her apartment the night following Stephen's death. In particular, appellant told her "Steve" was unable to inject

–8–

himself with methamphetamine, and appellant did it for him. Although appellant did not say how sizeable an injection he gave Steve, he did say "he was going to try and knock him for a loop." He stayed with Steve for about thirty minutes waiting for him to go to sleep. Steve was "okay" at first but then became "lethargic" and appellant left the room. Appellant told her he did not intend for Steve to die; he just wanted to "knock him out for a few minutes." This evidence not only corroborates the testimony of Smith and Rodriguez, it is sufficient to show beyond a reasonable doubt that appellant "actually assisted [Steve] with the injection." Moreover, it was sufficient evidence from which a jury could infer he was aware of the risk of death and disregarded it. We overrule the third issue.

In his first and second issues, appellant contends the trial court erred in denying his motions for mistrial after (1) a witness referenced an extraneous offense and (2) the prosecutor made an improper closing argument.

We review the trial court's denial of a mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). We uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010).

"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77; *see also Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009) (explaining mistrial should be granted "'only when residual prejudice remains' after less drastic alternatives are explored") (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. App.—Fort Worth 2005, *aff'd,* 189 S.W.3d 272 (Tex. Crim. App. 2006)). Prejudice is incurable when the objectionable material is clearly calculated to inflame the minds of the jurors or was of such damaging character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *See Rojas v. State*, 986 S.W.2d 241, 251 (Tex. Crim. App. 1998). In

–9–

determining whether a prejudicial event was so harmful as to warrant a mistrial, we consider (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004).

We begin with appellant's first issue, in which he complains that Smith testified he was a felon. The prosecutor asked Smith whether appellant said "anything about DNA or fingerprints" before leaving the Cummins residence. Smith replied, "Yes, yes. He was like our DNA and fingerprints are all over the house. And he is like my DNA is on file, [Watkins's] DNA is on file, we are both felons, I am going to burn down the house." Appellant argues the testimony implied extraneous offenses and was incurable.

Initially, we note an instruction to disregard will ordinarily cure error associated with a witness's improper reference to an extraneous offense committed by the defendant. *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009) (per curiam); *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (per curiam). After considering the factors set out above, we conclude such is the case here.

First, the question was aimed at eliciting Smith's testimony that appellant's DNA was all over the house, providing a motive for him to burn down the house. The record does not demonstrate the prosecutor's question was calculated to inflame the minds of the jury, and in fact, Smith testified outside the jury's presence that she was admonished by the State beforehand not to mention extraneous matters. Smith said she did not "intentionally" ignore the prosecutor's instructions, explaining the statement was "part of the conversation I was being asked about."

Second, the trial court immediately sustained appellant's objection and instructed the jury to disregard "the last response" given by Smith. The trial court also instructed the jury in each charge that it could consider extraneous-offense evidence only if it believed beyond a reasonable doubt that appellant committed such acts and then only for specified purposes.

Finally, as outlined previously, the jury had before it overwhelming evidence of appellant's guilt on all the charges. This evidence included his admissions to Hunt about what happened at the Cummins house. In addition, the jury heard other evidence that it was common in the "drug culture" of which appellant was a part for people to have criminal records.

Given the strength of the evidence against appellant and the trial court's instruction to disregard, we conclude the trial court did not abuse its discretion by denying appellant's request for a mistrial. *See Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) (concluding witness's uninvited and unembellished statement that defendant "had been recently released from the penitentiary" was not so inflammatory as to undermine efficacy of trial court's instruction to disregard); *Gardner v. State*, 730 S.W.2d 675, 696–97 (concluding witness's statement that "[defendant] told me that even when he was in the penitentiary, that he had stomach problems" was cured by trial court's instruction to disregard). We overrule the first issue.

In his second issue, appellant contends the trial court erred by failing to grant a mistrial after the prosecutor argued in closing that he was a "predator." He argues the argument was "far beyond the realm of permissible argument," "inflamed" the jury, and could not be corrected by instruction.

The complained-of argument was the following:

> And remember when we were picking this jury, when I was explaining to you the burden of beyond a reasonable doubt, I showed you a puzzle. Some of the pieces of the puzzle were missing, but you could all clearly tell what was in the puzzle. And [the defense attorney] has done a skillful job of point out to you the pieces of the puzzle that are missing. But when you go back and start deliberations, you are going to see a clear image of a predator, and you know who that predator is.

Appellant objected to "improper argument and name calling." The trial court sustained the objection and instructed the jury to "disregard the last statement of counsel," but denied a mistrial.

–11–

While name-calling by the prosecution is generally improper argument, if the characterization is supported by the evidence, then it is permissible as a reasonable deduction from the evidence. *See Burns v. State*, 556 S.W.2d 270, 285 (Tex. Crim. App. 1977) (holding reference to defendant being "animal" "was warranted" and not "improper deduction" from evidence); *Easley v. State*, 454 S.W.2d 758, 761 (Tex. Crim. App. 1970) (holding use of "savage," while not to be commended, was supported by evidence).

Texas courts have upheld arguments calling a defendant a fool, a vicious liar, a dog, a cold-blooded killer, a jerk, a troublemaker, and a one-man crime wave, and contending a defendant "has no conscience, no heart, no recognition of right or wrong [and is] perched on the rim of hell, looking deep into it" as reasonable deductions from the evidence in light of the facts of each case. *Kennedy v. State*, 193 S.W.3d 645, 657 (Tex. App.—Fort Worth 2006, pet ref'd) (citations omitted).

Here, the evidence showed appellant told a friend "all he saw was dollar signs" when he walked into the Cummins home. He planned to "hit a lick," but Stephen watched his "every move" so he had to wait. When Stephen asked for help in injecting a large dose of methamphetamine, he agreed and gave him the dose, which was enough to "knock him for a loop," and waited for Stephen to lose consciousness. After Stephen was found dead, appellant and Smith were "going through things" in one of the bedrooms until they were told to stop by Rodriguez and Ray. While Stephen's body lay in the bedroom, appellant and Smith went through the house taking everything they could before appellant lit the house on fire. Considering this evidence, we conclude the prosecutor's argument that appellant was a "predator" was a reasonable deduction from the evidence.

But even if improper, reversible error is not shown. Generally, any harm from an improper statement in a jury argument is remedied when the court instructs the jury to disregard,

unless the remark is so inflammatory that the prejudicial effect cannot be removed by an admonishment. *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985). The prosecutor's remark was isolated and the characterization was not particularly inflammatory. The trial court sustained the objection and immediately instructed the jury to disregard the statement. Finally, as set out previously, the State's cases against appellant were strong. Given these considerations, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial. We overrule the second issue.

We affirm the trial court's judgments.

/Molly Francis/

MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121568F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER JOEL GRAHAM,
Appellant

No. 05-12-01568-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80003-2012.
Opinion delivered by Justice Francis;
Justices Moseley and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2014.

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER JOEL GRAHAM,
Appellant

No. 05-12-01569-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80004-2012.
Opinion delivered by Justice Francis;
Justices Moseley and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2014.

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER JOEL GRAHAM,
Appellant

No. 05-12-01570-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80005-2012.
Opinion delivered by Justice Francis;
Justices Moseley and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2014.

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER JOEL GRAHAM,
Appellant

No. 05-12-01571-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80006-2012.
Opinion delivered by Justice Francis;
Justices Moseley and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2014

/Molly Francis/
MOLLY FRANCIS
JUSTICE