# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00619-CR

**Jack Warren Davis, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
## NO. CR-89-251, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Jack Warren Davis appeals this—his second conviction for the capital murder of Kathie Balonis on November 17, 1989. *See* Act of April 16, 1985, 69th Leg., R.S., ch. 44, § 1, 1985 Tex. Gen. Laws 434 (Tex. Pen. Code Ann. § 19.03(a)(2)(b), since amended). Appellant was charged in two counts with causing the death of Balonis by strangulation while in the course of committing or attempting to commit the offense of aggravated sexual assault or in the course of attempting to commit the offense of burglary. The jury returned a general verdict finding

appellant guilty as "charged in the indictment."[1]  The trial court assessed life imprisonment as the State had waived the death penalty.  We will affirm the conviction.

**Case History**

This cause has had a long history.  On May 11, 1990, a jury convicted appellant of the offense, but was unable to answer the special issue on deliberateness.  The trial court assessed punishment at life imprisonment.  That conviction was reversed by this Court based on prosecutorial misconduct and the cause was remanded to the trial court.  *Davis v. State*, 831 S.W.2d 426 (Tex. App.—Austin 1992, pet. ref'd) (*Davis I*).  Subsequently, appellant filed a pretrial writ of habeas corpus alleging that any retrial was barred by the double jeopardy provisions of the Texas and United States Constitutions.  The habeas court denied relief and this Court affirmed.  *Ex parte Davis*, 893 S.W.2d 252 (Tex. App.—Austin 1995, pet. granted) (*Davis II*).  The Texas Court of Criminal Appeals affirmed this Court's action.  *Ex parte Davis*, 957 S.W.2d 9 (Tex. Crim. App. 1997) (*Davis III*), *cert. denied*, 523 U.S. 1023 (1998).

Fred Zain, an employee of the Bexar County Forensic Scientific Center (BCFSC), testified at the first trial.  *Davis I*, 831 S.W.2d at 434, 442.  Subsequently, it was learned that Zain's assistant, Henry Hollyday, had actually done the DNA analysis that Zain testified that he had

---

[1] When different theories of the offense are submitted to the jury in the disjunctive, a general verdict is sufficient if the evidence supports one of the theories.  *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991).

performed; that in a civil suit deposition given by Zain it was established that Zain was in error as the blood on some carpet samples was not appellant's but the victim's blood; and finally Zain acknowledged an omission in his report about appellant's blood being on the collar of the victim's shirt was an oversight. Investigations followed and Zain exercised his privilege against self-incrimination under the Fifth Amendment to the United States Constitution when called to testify at the habeas corpus proceedings (*Davis II*). All of this led to a re-gathering of the evidence, the employment of a blood spatter expert, and a retesting of some of the evidence prior to the second trial.

In the interim between trials, there was also a change in prosecutors.[2]

Following an amendment of the indictment and an agreed change of venue, appellant's second trial was conducted in Blanco County. *See* Tex. Code Crim. Proc. Ann. art. 31.09 (West Supp. 2003). The appeal comes to this Court from Comal County. *See id.* art. 31.08.

**Points of Error**

Appellant advances four issues or points of error[3] as follows:

---

[2] On June 1, 1990, District Attorney Bill Reimer, the original prosecutor, was recused. On December 3, 1992, attorney Ray Taylor was appointed as District Attorney Pro Tem. Taylor withdrew from the case on December 6, 2000. The then elected Criminal District Attorney Dibrell Waldrip (who had been a witness in the first trial) was recused. On December 7, 2000, Lisa Tanner, Assistant Attorney General, was appointed District Attorney Pro Tem. She represented the State on the second trial and now on appeal.

[3] In another part of appellant's brief, a fifth point of error was added: "Trial Court erred in limiting the cross-examination of witnesses regarding other acts of Fred Zain in other cases." This fifth point of error was not briefed and was withdrawn and abandoned by appellant's counsel during oral argument before this Court.

3

Trial Court erred in overruling Appellant's objection to the evidence taken from the apartment of Kathy Balonis and from Appellant based on the State's inability to authenticate the manner in which the evidence was handled without testimony from Fred Zain?

Trial Court erred in granting the State's Motion in Limine and prohibited Appellant evidence concerning the manner in which Fred Zain handled evidence in other cases to show that the State could not properly authenticate the physical evidence presented?

Trial Court erred in overruling Appellant's motion to suppress evidence based on the State's inability to properly authenticate any physical evidence without the testimony of Fred Zain.

Trial court erred in sustaining the State's objection to the testimony of Jeanine Arvizu regarding the manner in which Fred Zain handled evidence in other cases.

[sic]

Appellant's brief is unusually structured and not always in accordance with our briefing rules. *See* Tex. R. App. P. 38.1. The points of error do not always correspond to the subject matters discussed under the "Argument and Authorities" division of appellant's brief. Appellant's manner of briefing has rendered our task of responding to appellant's contentions difficult.

**Background and Facts**

In light of appellant's contentions, the background and facts of this second trial are essential to a proper understanding of the case. Appellant's brief under "Statement of Facts" quotes the summary of evidence from this Court's opinion in *Davis I*, 831 S.W.2d at 429-433, involving the first trial. Appellant's reference to the facts of the instant case is limited. We find that the State's brief has accurately discussed the background and facts of the instant case with record references and with an important discussion of the physical and forensic evidence. We will set forth

4

the State's version while eliminating the footnotes: The State's version does contain some references to the first trial, *Davis I*, and the State habeas corpus proceedings, *Davis II*, which followed.[4]

**STATEMENT OF FACTS**

In 1989, Kathie Balonis was a 24 year old 3rd grade teacher at Bulverde Elementary School (6 RR 66, 7 RR 66). In June 1989, Kathie moved into the New Braunfels Oaks Apartments (hereinafter referred to as the Oaks) in New Braunfels, Texas at the urging of her older sister, Karen Balonis, who already lived there. (6 RR 67-68, 7 RR 69). Kathie had recently separated from her husband and the divorce was finalized in October 1989. (6 RR 67, 7 RR 67). The Oaks had six buildings in the complex. Kathie lived on the second floor of Building 2 on the western corner. Next door to her lived Marci French. Appellant lived on the ground floor of Building 2 in the second apartment from the east end. The building had three staircases, one on each end and one in the middle. (6 RR 110-111, State's Exhibit 8).

Appellant was the maintenance man at the Oaks. (6 RR 101, 7 RR 73). In that role, he had a passkey that gave him access to every apartment in the Oaks, 24 hours a day. (12 RR 232). On the evening of November 17, 1989, Appellant was wearing blue jeans, a tan, short-sleeved button down shirt, a blue down-filled vest, tennis shoes, and a maroon baseball cap. (6 RR 172). He was average build with brown hair that was somewhat long, and he had a thin beard. (State's Exhibit 9). On two separate occasions in the week prior to Kathie Balonis' murder, Appellant was seen using his passkey to go into her apartment at night when she was not home. (8 RR 148, 166). There were no work orders reflecting any maintenance calls to her apartment during that time period. (8 RR 170-172, 12 RR 234, State's Exhibit 29).

On the evening of November 17, 1989, Kathie went to a function held at her school. Afterwards, she stopped by a Target store in San Antonio to buy linens for her bed. She then traveled to Canyon Lake to visit her parents, Charles and Louise Balonis, who had just returned from a trip out of state. (7 RR 81). They visited for a short time, then Kathie headed home to the Oaks. (6 RR 74-75). Kathie had no

---

[4] The State's version refers to "CR" and "RR" as referring to the instant case. The first trial is referred to as "1st CR" and "1st RR" and the State habeas corpus proceeding is mentioned as "CRSH" and RRSH."

5

additional plans for that evening. (6 RR 76, 82). She had been dating a dentist named Gary Moczygemba for approximately two months, but he had gone hunting in South Texas with a friend. (6 RR 69, 76). When Kathie arrived home at the Oaks, she found her sister doing her laundry. (7 RR 78). Kathie stopped in the laundry room and visited with Karen for approximately 20 minutes, showed Karen a dust ruffle she just bought to put on her bed, then went up to her apartment around 9:00 p.m. (7 RR 80-81).

Shortly after 9:30 p.m., Karen went to the laundry room to put her clothes in the dryer. (7 RR 84). While she was separating her clothes out, Karen realized that she had forgotten fabric softener, so she ran back up to her apartment to get it. (7 RR 85). On her way back up to her apartment after having gotten the fabric softener and separating out her clothes, Karen heard Kathie's front door, which made a very distinctive sound. (7 RR 87). There did not appear to be any lights on in Kathie's apartment. (7 RR 87). After hanging up her laundry, Karen called Kathie's apartment but got no answer even though she let the phone ring for a long time. (7 RR 87).

The western stairs in Building 2 ran directly in front of Marci French's apartment and ended in front of a large picture window in her living room. (8 RR 183). Marci continuously kept the blinds on that picture window halfway up, so that her cat could sit on the ledge and look out. (8 RR 184). Consequently, anyone who came up the western staircase of Building 2 and attempted to go to Kathie's apartment would be seen by someone sitting in Marci's living room. (8 RR 185). Marci and Kathie's apartments were offset somewhat, so one could not see Kathie's front door from Marci's. (6 RR 122). However, the balcony was so small that one could take two steps from Marci's front door and be able to see Kathie's door. (8 RR 183).

On November 17, 1989, Marci French had company. Shelly Flynn, a friend from college, and her toddler son had flown in from Idaho to spend the upcoming Thanksgiving holiday with Marci. (8 RR 189). Shelly's parents, Mr. and Mrs. Kenneth Stainbrook, also arrived at Marci's apartment that evening. They lived in Minnesota and had traveled in their motor home to visit Marci and Shelly. (8 RR 190). Marci, Shelly, Mr. and Mrs. Stainbrook, and Shelly's son ran several errands that evening and arrived back to the apartment at about 9:00 p.m. They all went inside and visited in Marci's living room. (8 RR 191).

Shortly after 9:30 p.m., Marci heard "rumbling noises" coming from the direction of Kathie's apartment. (9 RR 194-195). Sometime between 9:30 and 10:00 p.m., Mr. Stainbrook heard the vibration of someone coming up the stairs just outside of Marci's apartment. (9 RR 156). He looked out the window and saw a man at the

6

top of the stairs who was wearing a blue vest and a baseball cap. (9 RR 157-158). Upon arriving at the top of the stairs, the man walked in a westward direction, which was towards Kathie's apartment. (9 RR 159). Some minutes later, Mr. Stainbrook saw the same man walk from the direction of Kathie Balonis' apartment, pass in front of Marci's window, then continue in an eastwardly direction along the second floor balcony. (9 RR 159-160). Mr. and Mrs. Stainbrook retired to the motor home for the night at approximately 10:00 p.m. (8 RR 197, 9 RR 91, 154).

After the Stainbrooks retired, Marci and Shelly continued to visit in Marci's living room. (8 RR 197). Their conversation was interrupted when Marci heard noises outside of her apartment. In response, she looked out the window and saw a man pass in front of her apartment on the balcony going from east to west towards Kathie's apartment. Marci was only able to see the side of the man from his ear to his waist. She saw that he was a white male wearing a light colored short-sleeve shirt, a blue puffy, tight-fitting vest, and had brown "scraggly" hair and was unshaven with "scraggly sideburns." (8 RR 198-199). Shelly saw the same man at the same time near the top of the stairs. She described him as being a white male wearing a lighter-colored short-sleeve shirt and a blue vest with "scruffy sideburns." (9 RR 92-93, 133, 142). She saw the man go in the direction of Kathie's apartment. (9 RR 93-94).

Marci was surprised by the presence of the man, because nobody ever traveled across the balcony in that fashion. (8 RR 200). Thus, she immediately stepped outside of her front door and looked towards Kathie's apartment. She saw nothing. (8 RR 200, 9 RR 94). She deduced that the man was in Kathie's apartment because he would not have had time to get down the stairs before she stepped outside. (8 RR 202). Marci was concerned for Kathie's well-being since it was late at night, but concluded that she must have been expecting someone. (8 RR 202, 9 RR 94). Shortly thereafter, Marci heard someone running down the steps outside of her apartment. (8 RR 203). At that same time, Shelly looked out and saw the same man she'd seen moments earlier, going down the stairs. She commented to Marci, "there he goes again." (9 RR 203-204, 9 RR 95). In response, both Marci and Shelly ran out onto the balcony. Kathie's door was shut and nobody was in the courtyard of the complex. (8 RR 204, 9 RR 96). Thus, they both went back inside. (8 RR 204).

After Marci and Shelly went inside, Marci sat with her back to the window, then heard someone running up the stairs outside of her apartment. (8 RR 205). Shelly, who was sitting facing the window, saw the same man as she had seen before come up the stairs and go in the direction of Kathie's apartment. (9 RR 96-97). Both girls again ran out of Marci's apartment and looked around. Again, they saw nothing. At that point, Marci decided to go over to Kathie's apartment to check on her. (8 RR 206). However, as she was going to the door, she saw someone coming from

7

Kathie's apartment. She bent down to look out her window and saw Appellant standing at the top of the stairs. (8 RR 207). She recognized Appellant as the maintenance man; in fact, she commented to Shelly, "Oh, that's the maintenance man. She must be having maintenance trouble." (8 RR 207, 9 RR 101). Shelly looked out and saw Appellant – the man Marci referred to as the maintenance man. Appellant was the same man Shelly had previously seen three separate times. (9 RR 101). When Marci saw Appellant at the top of the stairs, he appeared to be very calm. (8 RR 208). In fact, his demeanor calmed her, and Marci decided not to go check on Kathie. (8 RR 208-209). After Marci saw Appellant calmly walk down the stairs, she went to the wall that separated her and Kathie's apartments and knocked on it. She got no response. (8 RR 209-210).

The Oaks was managed by Carolyn Toth. Her mother, Doris Simms, was the assistant manager and lived in an apartment in the complex. At approximately 7:00 p.m., Toth and Simms took Mr. Simms across town to play bingo. They left Simms' apartment again around 9:30 to 9:45 to pick him up from bingo. (12 RR 238, 14 RR 120). As they were leaving the Oaks, Toth and Simms noticed a "burnt orange or beer bottle color" Vega like car speeding out of the Oaks parking lot. (12 RR 206, 14 RR 94). About 10:20 p.m. on November 17, Appellant knocked at Simms' door. When Toth answered the door, she found Appellant to be very upset. He said to her "Carolyn, Carolyn, it's horrible, it's horrible. You've got to come out here. . . . The girl in 202. . . I think she might have been stabbed." (12 RR 209-210). In response, Toth called the police. (12 RR 211). Toth immediately noticed that Appellant had blood on his hands and jeans. (12 RR 247). In fact, she commented to him when he first arrived at Simms' apartment, "My God, you've got blood all over you!" (12 RR 270).

Appellant testified that he had gone out on his front porch a little after 10:00 p.m. on November 17, 1989 to smoke a cigarette. (14 RR 177). He claimed to have heard someone shout "Hey" at the other end of Building 2. He looked that way and saw a man coming down the west stairs. (14 RR 179). He described the man as being white, having an average build, with stringy shoulder-length hair wearing a white t-shirt, blue jeans, and maybe tennis shoes. (14 RR 180). He said the man walked through the courtyard, along the backside of the pool out to the parking lot by Buildings 5 and 6. (14 RR 181). Appellant said he followed the man until he saw him get into a "beer-bottle," "orange brown mixed" Vega and drive away. (14 RR 182). Appellant said that he knew "something wasn't right" and decided to investigate. (14 RR 183). Appellant said that he went up the west stairs of Building 2, saw Marci French and her "company," and proceeded to Kathie's apartment. (14 RR 183). He said that he knocked on the door, got no answer, pulled out his passkey, but found the door to be unlocked, so he opened it. He said that he called out "Maintenance" two times then went in. (14 RR 184). Appellant said that when he

8

went into Kathie's apartment, her bed was blocking the bedroom door. (14 RR 196). He said he went around the bed, found Kathie, knelt on her right side, placed both of his hands underneath her shoulders, lifted her up, shook her, and called her name. (14 RR 188). Appellant said he got no response, so he put Kathie down and left the bedroom just as he came, then went straight to the Simms apartment for help. (14 RR 189-190).

At about 10:20 p.m., Karen had gone back down to the laundry room to get her clothes. She saw Toth, Simms, and Appellant calmly standing in front of the laundry room talking. (7 RR 88-89). As Karen passed, Toth told her that her "sister had been stabbed." (7 RR 89). Karen ran up to her sister's apartment, went inside and immediately noticed that Kathie's bed was blocking the door to her bedroom. (7 RR 91). Karen hopped over the bed and found Kathie sprawled out on her bedroom floor, her head under the bed, her legs spread, her pants and underwear down to her ankles. Kathie's shirt was pulled up, exposing her abdomen. Karen immediately noticed a cut to Kathie's abdomen area. (7 RR 92-93).

Marci saw Karen run up the stairs outside of her apartment, looking "wild-eyed." (8 RR 210-211). Marci immediately knew something was wrong so she followed Karen to Kathie's apartment. (8 RR 211). As soon as she got into the apartment, Karen asked her to call the police. (7 RR 95, 8 RR 212). Marci ran back to her apartment and asked Shelly to call the police. (9 RR 103). She then ran back to assist Karen who had begun doing CPR on Kathie. (7 RR 94, 8 RR 213). Shelly then ran to Kathie's apartment with the telephone because, since she was from out of town, she did not know the address to tell the police. (9 RR 103). Thus, she gave Marci the phone and she assisted Karen by putting pressure on the wounds to Kathie's abdomen. (7 RR 95, 9 RR 105). Shelly got blood on one of her hands, which she later washed off in Marci's sink. (9 RR 109). Karen Balonis got no blood on her hands in her attempts to help her sister. (7 RR 98, 16 RR 23, 35).

Scott Lange was the first officer on the scene. (6 RR 96). He found Karen doing CPR on Kathie. He attempted to radio for EMS assistance from Kathie's bedroom. However, his radio would only work outdoors, so he immediately ran out on the balcony. (6 RR 97-98). Dennis Keating arrived shortly after Lange. (6 RR 99). He removed Karen from Kathie's bedroom because she was "hysterical." (7 RR 204). In order to assist the EMS personnel, Keating removed Kathie's bed from her doorway and stood it up against a bedroom wall. (7 RR 205). After leaving Kathie's apartment, both Keating and Lange talked with Appellant, who told them of the long-haired man he says he saw, without any description of the man's clothing, the color of his car, or his direction of travel. (6 RR 101-102). Lange noted that one could smell alcohol on Appellant's breath and he appeared to be intoxicated. (6 RR 105). In response, Lange radioed a "Be on the Lookout" or "BOLO" to dispatch, which he

9

heard go out to officers in the area minutes later. (6 RR 104, 147). Both Lange and Keating, as well as other officers at the scene, noted that Appellant appeared to be overly hysterical over Kathie's death. In fact, several of them thought it odd that Appellant appeared more distressed than even Karen. (6 RR 106, 7 RR 209, 10 RR 103).

Dennis Keating interviewed Marci French and Shelly Flynn on the upstairs balcony of Building 2 very shortly after Kathie's murder. Keating audiotaped his interview with Marci, but the batteries ran out before he could tape Shelly's interview. (7 RR 207). Both girls told Keating of seeing the man in the "blue puffy vest." Appellant matched the description both girls gave of the man they repeatedly saw go in and out of Kathie's apartment. (7 RR 213).

Montgomery Kama was the lead detective in the investigation into Kathie's murder. (6 RR 159). He talked to Appellant while at the Oaks in the courtyard. While they talked, Kama noticed a large dark, wet stain on the pocket of Appellant's jeans and red spots on his shoes, all of which turned out to be Appellant's blood. (11 RR 218). Kama shined his flashlight on the stain on Appellant's pocket and inquired about it. In response, Appellant told Kama that it was "pizza sauce." (6 RR 173-174). After Appellant told him the stain on his pants was pizza sauce, Kama inquired about the spots on his shoes. At that point, Appellant showed Kama a fresh, bleeding 1/4 to 3/8 inch cut on the palm of his left hand. (6 RR 174-175). Appellant told Kama that he had cut his hand earlier in the afternoon opening a package. (6 RR 174). Kama had other officers take Appellant to the detectives offices for an interview.

Lt. Felix Roque and Dib Waldrip, a reserve officer, formally interviewed Appellant shortly after midnight on November 18. After the interview was completed, they discovered that the audiotape recorder had malfunctioned and not recorded the interview. Thus, they re-interviewed Appellant with the recorder working. (7 RR 140-142). Appellant told Roque and Waldrip about seeing the long haired man that he had earlier told patrol officers about. However, he told them that, due to poor lighting, he could not provide a clothing description for the man. (7 RR 155, 185).

After completing the interview, Waldrip looked at Appellant's clothing. He was "shocked" to see the amount of blood that was on Appellant's clothing, particularly on his back right shoulder. (7 RR 144). Based upon what Appellant had told them, Waldrip found it "odd as to how did blood get on [Appellant's] back and that much blood?" (7 RR 144). Appellant attempted to explain the presence of such a large amount of blood on his shoulder by saying that he and Karen Balonis hugged one another on the balcony. (14 RR 193). He claimed that Karen must have transferred

10

Kathie's blood to his vest during that embrace. Karen Balonis said that Appellant embraced her sometime after the police began videotaping, but she vehemently denied hugging him back. (7 RR 103, 16 RR 23). Carolyn Toth claimed to have seen Karen and Appellant hug 15 to 30 minutes after the police arrived. (12 RR 216, 257).

During the interview, Waldrip and Roque noted that Appellant appeared to have a bruise or reddened area on the corner of his left eye. Additionally, Waldrip noticed a 1/8 inch wide, 6-8 inches long scratch down Appellant's left forearm. Appellant had no explanation for either injury. (7 RR 145, State's Exhibit 28e, p. 10).

With regard to the cut on his hand, Appellant told Roque and Waldrip that he had cut his hand at "lunch time" attempting to open boxes. (State's Exhibit 28e, page 10). After lunch on November 17, Appellant worked closely with Carolyn Toth painting and cleaning an apartment for a new tenant. (12 RR 241). Appellant never commented about having cut himself at lunch time, nor did Toth see any blood or a cut. (12 RR 243). Later, Appellant revised when he cut his hand, testifying that he had done so after he had gotten off of work that afternoon. (14 RR 232). Appellant said that he did not bandage his hand; instead, he pressed it against his jeans to stop it from bleeding. (14 RR 233). Nobody Appellant interacted with during the afternoon and evening of November 17, 1989 saw any blood on his hands or clothing, nor did they see a cut to his hand. Appellant said that his hand bled inside of his truck and he used a rag inside the truck to stop the bleeding. (15 RR 49). However, no blood or bloody rag was found during the search of Appellant's truck. (15 RR 49, State's Exhibits 95, 96, 100).

During the interview with Roque and Waldrip, Appellant recounted his activities for the day and evening before he ended up in Kathie's apartment. Appellant told them that, after getting off work, he had gone to Landa Station, where he worked part-time, "posted the bills" there, and was back home at his apartment before 7:00 p.m. (7 RR 156, 185, State's Exhibit 28e, page 4). In fact, after he got off work at the Oaks, Appellant went to Landa Station at about 6:00 p.m., where he drank at least four to six tea glasses of wine. (8 RR 66). After that, Appellant went to a bar called Kings and Queens. While there he played several games of darts with Mark Blankenbeckler and Pam Bennett. (8 RR 78, 107). Neither Blankenbeckler or Bennett saw any blood on Appellant's clothes or hands, or a cut on his hand, nor did Appellant say or do anything to suggest that he had a cut to his left hand. (8 RR 79, 114-115). After they played darts, Appellant asked Pam Bennett, who was a close friend of his wife and who had attended their wedding, to sit at a table with him so that they could talk. Appellant told her that his wife had left him and moved back to Mississippi. (8 RR 108). Appellant asked Pam to leave the bar and go to Holiday Inn with him so that they could talk privately. Pam declined, but Appellant persisted

11

and continued to ask her to leave with him. (8 RR 109-110). Appellant also told Pam that he had always liked her and found her pretty and nice. Pam felt that Appellant was "coming on to her." (8 RR 111). Eventually, in order to get Appellant to leave her alone, Pam agreed to meet him at the Holiday Inn the following Sunday afternoon, although she actually had no intention to do so. (8 RR 111-112). After Appellant left Kings and Queens, Pam's date arrived. She immediately commented to him, "thank God you're here because he's been bothering me," referring to Appellant. (15 RR 191). After Appellant left Kings and Queens, he went back to Landa Station to "see who was there" at about 9:00 p.m. (14 RR 245). He looked around the establishment, then left. (8 RR 67). Contrary to what he told Roque and Waldrip, Appellant actually arrived home around 9:15 p.m. (13 RR 178).

When Appellant got home on the night of November 17, his step-son and his wife, Raymond and Marie Powell, were in his apartment watching *Back to the Future*. Appellant told Roque and Waldrip that they left and went home "when the movie was over." (State's Exhibit 28e, page 4). As set forth above, the movie itself was over shortly before 9:30 p.m. (7 RR 84). While they were in the courtyard that night, Appellant told Carolyn Toth that the Powells had gone home at 9:30 p.m. (12 RR 271, 13 RR 20). Nonetheless, Appellant, Raymond Powell, and Marie Powell all testified that they did not leave Appellant's apartment until after 10:00 p.m. (13 RR 182, 222, 14 RR 176). Thus, Appellant contended that he had an alibi for Kathie's murder. Raymond and Marie Powell both testified that they did not arrive home until just before 10:30 p.m. (13 RR 198, 222). Both said that they stopped at a store on the way home and bought two beers. (13 RR 197, 234). They said that when they got home, Raymond turned on the television and sat down and watched a wrestling program until it was over. (13 RR 183, 235). He said that while he watched it, he had time to brink both of the beers he had just bought. (13 RR 198). However, the local television guide for November 17, 1989 listed the only wrestling program that aired that night as running from 9:15 to 10:15 p.m. (State's Exhibit 125, 125a, 13 RR 207). Thus, in fact, Powell could not have gotten home at 10:30 and still watch wrestling; whereas, if he left Appellant's apartment at 9:30 p.m., he would have had time to watch the program as he said he did.

Raymond Barr testified that he had seen a man in a white t-shirt with stringy long black hair go up to Kathie's apartment between 4:00 and 5:00 p.m. on November 17, 1989. (13 RR 161-162). Jessica Brugmann testified that she heard water running in Kathie's bathtub between 4:00 and 5:00 p.m. on November 17. However, in another statement, Barr had mentioned that on the day he saw the man go up to Kathie's apartment, Appellant and Raymond Powell had been barbequing in the courtyard at the Oaks. (15 RR 217-218). Appellant and Raymond Powell did not barbeque on November 17, 1989. (15 RR 78). Additionally, because they had common plumbing, one could hear water running in Marci French's bathtub while

12

in Jessica Brugmann's apartment just as if it were running in Kathie's apartment. (11 RR 143). After Marci picked Shelly Flynn up at the airport, they went to Marci's apartment and immediately gave Shelly's young son a bath. That occurred around 5:00 p.m. on November 17. (8 RR 189-190).

After Roque and Waldrip concluded their second interview with Appellant, he was taken back to his apartment so that he could change clothes. All of his clothing, with the exception of his shoes and underwear, were collected by New Braunfels Police Department. Thereafter, Appellant was taken back to the police department for fingerprinting. A palmprint was made of his left hand, which clearly showed the bleeding wound to his palm. (State's Exhibit 10). Afterwards, Appellant was arrested for the murder of Kathie Balonis. (6 RR 180). Upon his arrest, Appellant's shoes and underwear were seized. (9 RR 194).

In spite of the fact that Appellant was charged with Kathie's murder, investigators continued to investigate his claim of having seen a long haired man leave her apartment. Detective Kama verified the whereabouts of Kathie's boyfriend, Gary Moczygemba, as well as her former husband and quickly eliminated them as suspects. (6 RR 192). Additionally, detectives investigated the whereabouts of Ross Risz. He was young man who Kathie had briefly dated who had shoulder-length dark hair and had once driven a burnt orange colored Vega. (15 RR 248). On November 20, 1989, Detective Kama interviewed Risz as well as some of his acquaintances. (6 RR 188-189). Risz was at a bar in Seguin on the night of Kathie's murder. (15 RR 243, 250). Additionally, Risz had sold his Vega in 1985. (15 RR 251, State's Exhibit 16). Nonetheless, Kama located the car on November 19, 1989 and found it to be inoperable. (6 RR 191, State's Exhibits 13, 14, 15).

At some point after Appellant's arrest, it was learned that Kathie had been making phone calls to a bar in San Antonio. (CRSH 5). In 1991, Toth, Simms, Brugmann, and an investigator who was working for Appellant went to that bar. (13 RR 28-29, 14 RR 129). Simms identified an employee of the bar, Richard Eppley as a man who had dated Kathie and who drove a dark orange Vega-like car. (14 RR 130). In fact, Simms identified a car outside of the restaurant as the one she had seen speeding away from the Oaks on November 17, 1989. (14 RR 128, 134, State's Exhibit 135). However, Kathie was actually calling the bar to talk to an old high school friend, who was the manager. (15 RR 259-260). In fact, Richard Eppley had never met Kathie Balonis. (15 RR 269). Additionally, Richard Eppley was in Atlanta, George October through December 1989 installing security systems. (15 RR 268, 278). Finally, the car depicted in State's Exhibit 135 that Doris Simms said was the car she saw speeding from the Oaks on November 17 was not owned by Richard Eppley, but by another employee of the bar. That employee did not even purchase the car until after Kathie Balonis was murdered. (16 RR 6, State's Exhibit 138).

13

## STATEMENT OF FACTS RELATING TO
## PHYSICAL AND FORENSIC EVIDENCE

Mario Guerrero was a detective with the New Braunfels Police Department and was in charge of collecting and maintaining physical evidence. (9 RR 181). As such, he collected all of the physical evidence in the instant case. Guerrero placed each item he collected into a separate bag. (9 RR 188). As the New Braunfels Police Department did not have an evidence vault in 1989, Guerrero stored all of the evidence in his locked office. (9RR 189).

While processing the scene of Kathie's apartment, Guerrero noticed several hairs in Kathie's hands. Thus, Guerrero instructed officers to videotape the hairs. Additionally, consistent with his training at the time, Guerrero taped brown paper bags over Kathie's hands in order to preserve the hairs. (9 RR 191). Those hairs were not long and dark, as one would expect them to be if Appellant's story were true, but were light brown in color, like Appellant's hair. (10 RR 102).

Kathie's body was transported to the Travis County Medical Examiner's Office for autopsy. Dr. Roberto Bayardo performed an autopsy on her body the morning of November 18. Dr. Bayardo noted that Kathie had a small cut on the middle finger of her left hand, which he characterized as a "defensive wound." (10 RR 153, State's Exhibit 111). That wound was inflicted prior to Kathie's death. (10 RR 153). Dr. Bayardo determined that Kathie was strangled to death, both manually and with a ligature. The cord from the iron found in her bedroom was a "perfect match" to the injuries on her neck. (10 RR 157-159). Dr. Bayardo found several superficial scratches to Kathie's breasts, two three inch deep puncture type wounds to her abdomen, and a stab wound to her labia. Those injuries were all inflicted after Kathie's death. (10 RR 154, 156, 159). Dr. Bayardo found the stabbing injuries to Kathie's body to be consistent with having been inflicted by a pocketknife. Three witnesses on behalf of the State testified that Appellant regularly wore a pocketknife in a leather pouch on his belt while he was the maintenance man at the Oaks. (8 RR 63, 142, 163).

Upon seeing Appellant's left palm print with the cut to it, Dr. Bayardo characterized the cut as a "fresh wound." (10 RR 174). He said that it would be unusual for one to bleed substantially twelve hours after such a wound was inflicted. (10 RR 175). Additionally, if one were to re-open such a 12 hour old wound, mostly blood serum, not whole blood would come out. (10 RR 213).

Mario Guerrero and Montgomery Kama attended Kathie's autopsy. However, they were late and, by the time they got there, Dr. Bayardo had already begun. (6 RR 182-183, 9 RR 196). Prior to their arrival, Dr. Bayardo had removed the bags from

14

Kathie's hands and, seeing nothing in them, threw them away. (10 RR 151). Neither Guerrero or Kama said anything to Dr. Bayardo about the hairs that had been in Kathie's hands. (6 RR 184, 9 RR 198). Thus, those hairs were apparently thrown away with the bags. (3 RR 158).

During autopsy, Dr. Bayardo drew Kathie's blood. He placed the blood in a tube that did not contain any preservative to keep the blood from degrading. (10 RR 164). Additionally, he collected several swabs from Kathie's body during the "rape kit" examination. (10 RR 162). After autopsy, Dr. Bayardo turned over the blood and "rape kit" to Guerrero. He turned over Kathie's clothes to the funeral home, from whom Guerrero then collected them. (9 RR 199, 10 RR 164).

On November 28, 1989, Guerrero took all of the evidence to the Bexar County Forensic Sciences Center (BCFSC) for forensic analysis. (3 RR 16). Guerrero took additional evidence to the BCFSC as it was obtained. On December 1, 1989, Guerrero turned over Appellant's known blood sample to the laboratory. (3 RR 17). On December 6, 11, 18, 1989 he took additional items to the BCFSC for analysis. (3 RR 17-18). On February 21, 1990, Guerrero took several items of evidence back to the laboratory for additional analysis. (3 RR 18, Defendant's Pretrial Exhibit E). Each time he took evidence to the lab, Guerrero turned it over to Fred Zain, who was the Chief of Forensic Evidence. Zain had been hired in January 1989 and had previously been employed as a forensic serologist with the West Virginia State Police for 13 years. (12 1stRR 2083).

Fred Zain testified several times on behalf of the State at Appellant's original trial. Zain testified that he had conducted DNA analysis on numerous blood stains and samples. He testified in particular, that DNA analysis revealed that the largest blood stain on Kathie's carpet, which had been located underneath her body, originated from Appellant, as did a smaller stain close to Kathie's body. (12 1st RR 2134-2135). Zain testified that one of the four distinct bloodstains on a blue pillowcase from Kathie's apartment was Kathie's blood. (12 1stRR 2132-2133). Zain also testified that a small bloodstains on the neck of Kathie's pink turtleneck shirt was that of Appellant. (12 1stRR 2123-2125). This result was not contained in any report that Zain submitted pertaining to the instant case. He characterized its absence as an "oversight" due to his numbering system. (12 1stRR 2140-2141, 2465). Zain also testified that he used Kathie's blood sample obtained at autopsy as her known sample for comparison purposes. (12 1stRR 2086).

During civil litigation subsequent to Appellant's first trial, it was revealed that, in fact, Henry Hollyday, not Fred Zain conducted all of the DNA testing in Appellant's case. (1 RRSH 38, 115, 10 RR 116, 129). Hollyday's DNA results from the large bloodstain on the rectangular shaped carpet cutout were actually

inconclusive, but was more consistent with Kathie's blood than Appellant's. (1 RRSH 120). Hollyday actually did no testing on the small bloodstain on the irregular carpet cutout. (1 RRSH 123). Finally, it was revealed that, in fact, Dr. Bayardo had placed Kathie's autopsy blood sample in a container with no preservative. (1 RRSH 131). Hollyday examined the blood, was visually able to determine that it was too degraded to use, and, thus, it was destroyed. (3 RR 94, 10 RR 118). Therefore, Zain instructed Hollyday to take a cutting off of Kathie's pink turtleneck shirt and use that as her known sample. (1 RRSH 132-133). Fred Zain was called to testify at Appellant's habeas corpus proceeding. When he was confronted with his apparent perjury, Zain invoked his right against self incrimination. (2 RRSH 423).

At state habeas, the trial court issued findings of fact and conclusions of law that included the conclusion "that it is highly probable that Fred Zain committed aggravated perjury" during Appellant's original criminal trial. (Supp. CRSH 3). Further, the trial court concluded that "Zain's conduct was intentional and outrageous and shocked the conscience of the court." (Supp. CRSH 2). However, the trial court did not find that Fred Zain tampered with, or altered any of the physical evidence or biological stains that were submitted to him.

Subsequent to Zain's testimony at Appellant's original trial, questions arose regarding irregularities in Zain's work in both Texas and West Virginia. Officials became concerned that Zain was not backing up his work with proper documentation and may not have been doing the testing at all. (3 RRSH 6). As a result, several investigations and audits were conducted in both states. The Southwest Institute of Forensic Sciences (SWIFS) in Dallas reviewed Fred Zain's casework in Bexar County and issued a report on July 15, 1993. The report reflected that the BCFSC maintained inadequate record in a variety of areas, had insufficient quality controls, had unacceptable record keeping practices, often wrote reports that overstated the power of DNA and serology results, and maintained physical evidence in a confusing and inadequate way. (Defendant's Pretrial Exhibit I, 3 RRSH 17). Dr. Irving Stone, the author of the report, testified at Appellant's state habeas proceeding regarding his findings. He was of the opinion that any test results Fred Zain reported were suspect and any testing "*ought to be repeated*." (3 RRSH 34). At no time in either his testimony or his report did Dr. Stone indicate that he found any evidence or suggestion that Fred Zain ever planted or fabricated physical evidence.

The Federal Bureau of Investigation (FBI) also conducted a review of DNA testing procedures and results of BCFSC and issued reports on July 19, 1994 and February 13, 1995. (Defendant's Pretrial Exhibit C and D). The FBI concluded that quality controls, case note documentation, sample labeling, statistical evaluation, and second reviews were all inadequate. Consequently, the FBI concluded, these deficiencies made it difficult to have complete confidence in the BCFSC DNA

16

results. The reports went on to list deficiencies in a number of specific cases. The July 19, 1994 report listed the following regarding the instant case:

> The review of this case discovered a number of discrepancies. For example, carpet sample number 26 was supposedly mislabeled as sample number 20 in the case notes and autoradiographs. Sizing determinations for the human DNA control were clearly out of bounds, making further analysis with these results inappropriate. Finally, no DNA profile results were obtained for the pillow case sample number 2 as indicated in the June 1, 1993 report. (Defendant's Pretrial Exhibit C, p. 3).

In listing the inadequacies in individual cases, the FBI never documented in any case any concerns that physical evidence may have been planted or fabricated by Fred Zain.

Fred Zain was also investigated in West Virginia. [At habeas corpus proceedings], the trial court has taken judicial notice of the report of the West Virginia investigation, as found in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory Serology Division*, 438 S.E.2d 501 (W.Va. 1993). That report sets out findings that Fred Zain overstated the strength of results and frequency of genetic matches, reported inconclusive results as conclusive, altered laboratory records, failed to report conflicting results or conduct additional testing to resolve conflicts, and reported scientifically impossible or improbable results, among other things. *Id*. at 516. However, any allegation that Fred Zain fabricated, planted, or altered physical evidence is conspicuously absent from the West Virginia report. In fact, the report notes that two of Zain's fellow serologists testified that "Zain did not, as far as they knew, fabricate evidence." *Id*. at 512, n.13.

In preparation of Appellant's second trial, the State enlisted the assistance of Mr. Tom Bevel, a crime scene reconstruction bloodstain pattern analyst from Oklahoma and LabCorp, a private laboratory in North Carolina. (10 RR 222, 225). On December 28, 2000, Bevel traveled to New Braunfels and inspected all of the physical evidence in 2001. (12 RR 18, 108). He noted a number of small bloodstains that had apparently never been circled, cut from, or analyzed in any way by anyone at BCFSC. (12 RR 20). Thereafter, the State sent all of the physical evidence *via* Federal Express to LabCorp. Upon its arrival, the State's investigator traveled to the laboratory to be present for the lab personnel's inspection of it. (10 RR 227). LabCorp personnel examined each individual item of evidence over a two day period and took approximately 60 new cuttings from the bloodstains that remained on the evidence and subjected them to DNA analysis. (11 RR 193). A number of those cuttings came from bloodstains that had not previously been circled

17

or cut from by Fred Zain. Those stains were of particular significance to lab personnel, since it would not have made sense for Zain to have planted blood then not test the stains. (10 RR 231). Although cuttings made by Fred Zain were included in the submission to LabCorp, they did no forensic analysis on any of them in order not to have to rely on any of his work. (10 RR 230).

Because the blood from Kathie's autopsy was degraded and was consequently destroyed, LabCorp personnel conducted DNA analysis on the vaginal and oral swabs from her rape kit and used them as her known sample. (10 RR 236, 11 RR 194). In March, 2001, the State executed a search warrant upon Appellant to obtain a sample of his saliva to be used as his known sample for DNA analysis. (10 RR 237).

LabCorp's DNA analysts were able to determine whether a number of stains originated from Appellant or Kathie. There were three drops of Appellant's blood present on Kathie's doorjamb and a number of small drops on a blue floormat just outside of her front door. (11 RR 227, State's Exhibits 42, 43, 83). Additionally, there was a small spot of Appellant's blood on a mat just inside of Kathie's door. (11 RR 207, State's Exhibits 4, 84, 85, 86). Appellant's blood was also present on at least three of four distinct and separate bloodstains on a blue pillowcase from Kathie's bed. (11 RR 230). Contrary to Zain's prior testimony, the small bloodstain on the neck of Kathie's turtleneck, as well as the large bloodstain on the carpet, were both consistent with Kathie, not Appellant. (11 RR 212, 213-215). A small stain of Kathie's blood was present on the right leg of Appellant's jeans. (11 RR 219). Additionally, an extremely small stain of Kathie's blood was on Appellant's right shirt sleeve. (11 RR 211). A much larger stain of Kathie's blood was located on the back right shoulder of Appellant's blue vest. (11 RR 216-217). None of Appellant's blood was around the back shoulders or armpits of Kathie's clothing. (11 RR 42). There was no blood on the sweatshirt Karen Balonis was wearing when she attempted to help her sister. (11 RR 61). Microscopic and DNA analysis revealed that Appellant had ejaculated in the underwear he was wearing on the night of November 17, 1989. (11 RR 223-224).

Tom Bevel found that the bloodstain patterns he examined were inconsistent with Appellant's story. (12 RR 50). Specifically, Appellant's story of having entered Kathie's apartment with a bleeding hand was inconsistent with his bloodstains on her floormats and doorjamb. Bevel testified that the most probable scenario is that his blood trail originated inside Kathie's apartment rather than outside. In other words, Appellant bled on the way out of Kathie's apartment, not on the way in. (12 RR 28-29). Additionally, Bevel found that the absence of Appellant's blood on the back of Kathie's sweater was inconsistent with his story of having placed his bleeding hand underneath her and lifting her up. (12 RR 34-35). Bevel found that the tiny stain of

18

Kathie's blood on Appellant's shirt sleeve was applied with a significant amount of force, essentially, that it flew through the air. (11 RR 37-40).

Bevel concluded that the most likely source of the blood on Appellant's right shoulder was Kathie's bleeding finger being placed directly upon the vest. (12 RR 45). He testified that Appellant's exculpatory story that he got Kathie's blood on his shoulder during a hug with Karen Balonis was only possible if she would have gotten a high volume of blood on her hands and then touched his shoulders within just a few moments of it getting on her hands. (12 RR 43). As set forth above, if a hug occurred, it was at least 15 to 30 minutes after the police arrived. Bevel testified that if Karen had blood on her hands and if she touched Appellant's shoulder 15 minutes after having gotten it on there, it would not have even left a stain. (12 RR 43). Finally, Bevel testified that if Karen had the volume of blood on her hands required to leave such a stain on Appellant's shoulder, it would have been very obvious that she had blood on her hands. (12 RR 44-45).

### Authentication of Evidence

We begin with appellant's first point of error as stated: "Trial court erred in overruling appellant's objection to the evidence taken from the apartment of Kathy Balonis and from appellant based on the inability to authenticate the manner in which the evidence was handled without testimony from Fred Zain? [sic]"[5]

The point of error stands alone, unadorned with a description of the items involved and without a record reference as to where the evidence was introduced, or a description of the

---

[5] Fred Zain was not called as a witness by either party in the instant case. Both parties agreed that Zain would take the "Fifth Amendment" and not testify if called based on his claim of the privilege against self-incrimination in the habeas corpus proceedings. *See Davis II*. At appellant's request, the trial court instructed the jury in the court's charge:

You are instructed that Fred Zain testified in prior proceedings in this case. Subsequently, he was called as a witness and asserted his right to remain silent under the Fifth Amendment.

19

"objection" to the evidence. There is no separate argument or authority advanced for point of error one. *See* Tex. R. App. P. 38.1(h). Nothing appears to be presented for review.

Under the general "Arguments and Authorities," we find a subdivision "A. The Chain of Custody." Appellant may have intended to brief his first contention here although the first point of error is not mentioned. Appellant states:

> Under the facts of the instant case, the State failed to authenticate four items, specifically blood stains on the complainant's sweater, a pillowcase, appellant's blue jeans and his shirt. The trial court erred in admitting evidence of those stains because the State failed to prove through a chain of custody that the items had not been altered even though there was evidence that either the stains were not on the evidence at the time it was seized or that the State's expert could not explain how the stains got on the evidence.

If these were the items to which appellant had reference in the first point of error, we still are not told where in this voluminous record these items were introduced into evidence and what objections were levied against their offer at the time or how error was preserved as to these particular items. The exhibit numbers are not even mentioned as an aid. There has been no compliance with our briefing rules. *See* Tex. R. App. P. 38.1(h). The burden is on the appellant to make accurate references to the record and show that the record supports the contention asserted. A reviewing court has no duty or required task to search a voluminous record page by page in an attempt to verify an appellant's claims. *See Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995); *Reed v. State*, 927 S.W.2d 289, 291 (Tex. App.—Fort Worth 1996, no pet.). Here, there were no references to relevant record pages, *Aldrick v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1990), and no cites to the record where the objections, if any, were interposed. *See Lape v. State*, 893 S.W.2d 949, 953

20

(Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). The right to appellate review extends only to complaints made in accordance with the rules of appellate procedure. *Foster v. State*, 779 S.W.2d 845, 864 (Tex. Crim. App. 1989). Point of error one is inadequately briefed.

Taking a liberal view of the briefing rules, considering the State's response, and assuming that appellant did timely and specifically object to the items in question and received adverse rulings, *see* Tex. R. App. P. 33.1, we take note of the law applicable to authentication. Texas Rule of Evidence 901 provides the requirements for authenticating or identifying evidence. Rule 901 provides in pertinent part:

> (a) **General Provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> (b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> > (1) *Testimony of witness with knowledge*. Testimony that a matter is what it is claimed to be.
> >
> > . . .
> >
> > (4) *Distinctive characteristics and the like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Tex. R. Evid. 901.

The Rules of Evidence do not specifically address or define the terms "proper custody" and "chain of custody." Rule 901(a) makes clear that the authentication or identification of an item for admissibility purposes is satisfied if the evidence is sufficient to support a finding that

21

the item in question is what its proponent claims. *Kingsbury v. State*, 14 S.W.3d 405, 407 (Tex. App.—Waco 2000, no pet.); *Silva v. State*, 989 S.W.2d 64, 67-68 (Tex. App.—San Antonio 1998, pet. ref'd); *Simmons v. State*, 944 S.W.2d 11, 12 (Tex. App.—Tyler 1996, no pet.); *Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd). Thus, the proof of custody goes to the weight of the evidence rather than its admissibility. *Kingsbury*, 14 S.W.3d at 407. Proof of the beginning and the end of the chain of custody will support the admission of the evidence in the absence of any showing of tampering or alteration. *Stokes v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989); *Penley v. State*, 2 S.W.3d 534, 537 (Tex. App.—Texarkana 1999, pet. ref'd). Gaps in theoretical breaches in the chain of custody will not normally affect the admissibility of the evidence. *Lagrove v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997); *Ford v. State*, 26 S.W.3d 669, 674-75 (Tex. App.—Corpus Christi 2000, no pet.); *Porter v. State*, 969 S.W.2d 60, 66 (Tex. App.—Austin 1998, pet. ref'd).

Some of our better-known Texas commentators have stated:

> When real evidence is offered, often its condition as well as its identity is important. When this is so, a proper foundation must include evidence that the item is in substantially the same condition when presented as at the legally material time, e.g., the time of the accident, the time of first discovery, etc. *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960). Like identity, continuity of condition can sometimes be shown by a single witness. If any plausible material change in the object would be palpable, it suffices that the witness who identifies the object also testifies that it appears to be in the same condition as when previously perceived by him. *Hammett v. State*, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979). If, on the other hand, the object is of a nature that admits a risk of material but impalpable change—such as a chemical or bodily fluid specimen—then mere assertion by the identifying witness of the absence of any apparent change in its condition may not suffice. In such a case, continuity of condition must be established by a chain of custody. *Easley v. State*, 472 S.W.2d 128, 129 (Tex. Crim. App. 1971); *Moore v. State*, 821 S.W.2d 429, 431 (Tex. App.—Waco 1991, no pet.). It is not required,

22

however, that all possibility of tampering or adulteration be eliminated. *Salinas v. State*, 507 S.W.2d 730, 731 (Tex. Crim. App. 1974); *Kingsbury v. State*, 14 S.W.3d 405, 407 (Tex. App.—Waco 2000, no pet.) ("Absent evidence of tampering or commingling, theoretical breaches in the chain of custody do not affect the admissibility of evidence."); *Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd).

2A Steven Goode et al., *Texas Practice: Courtroom Handbook on Texas Evidence* § 9.01 (West 2003 ed.); *see also Davis I*, 831 S.W.2d at 443.

With this background, we turn to appellant's complaint that the State failed to authenticate four items of evidence. There is really no dispute that the victim's sweater, a pillowcase, appellant's jeans and shirt are exactly what the State claims they are. These items were properly identified and authenticated before being admitted. It is the bloodstains that appellant urges were not authenticated.[6] Appellant generally contends that the bloodstains cannot be explained by the State's blood spatter expert. "For example, Tom Bevel, testified that for the blood to have gotten on the back of the complainant's sweater, she had to be picked up and moved about two feet into a blood smear on the carpet. The sweater did not slide through the blood." This is appellant's total argument that there was no chain of custody established as to the bloodstain on the sweater because Zain was not called as a witness and because the State failed to show lack of alteration.

The victim was shown to have been wearing a sleeveless sweater over a pullover turtleneck shirt when she was killed. Both garments were collected by Officer Mario Guerrero after

---

[6] Proof of the chain of custody is vital to the admissibility of evidence if its relevant characteristics are distinguishable only by scientific tests or analyses. *Davis I*, 831 S.W.2d at 443 (citing *Hammett v. State*, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979)).

23

Balonis's autopsy. There was a substantial apparent bloodstain on the white sweater. The stain was obviously a transfer stain as Kathie Balonis had suffered no wounds to her back. The garments were transferred to the Bexar County Forensic Scientific Center. No DNA or serological analysis was ever performed by Fred Zain or Henry Hollyday on the sweater's stain. In 2001, LabCorp attempted to obtain DNA results from the stain but were unsuccessful. However, a bloodstain was located on the turtleneck shirt directly underneath the large stain on the sweater. DNA testing on the small stain was consistent with Balonis's blood and inconsistent with appellant's blood. This led to a conclusion that the larger stain on the outer sweater originated with Kathie Balonis. Officer Guerrero testified that the sweater was in the same form and condition when it was returned from BCFSC as when it was collected. There was no showing that there was any tampering or alteration to the sweater. The mere fact that Zain was not available to testify did not require exclusion of the sweater or its bloodstains. Any gap in the chain of custody goes to the weight. *Porter*, 969 S.W.2d at 67. The trial court did not err in admitting the sweater.

With regard to the other items, appellant states:

Likewise, Bevel conceded, based on descriptions and transcripts from Officer Felix Roque who described Appellant's blue jeans the morning of the murder, there is no evidence that a blood stain was on the leg of the jeans that morning even though Bevil [sic] later found such a stain. Bevil [sic] also testified that he could not find pictures of blood drops on a pillowcase in scene photos. Bevil [sic] also was unable to explain how a single drop (as opposed to several drops) of blood spatter got onto Appellant's shirt.

. . .

All of the exhibits had been in Zain's custody, as well as blood samples from both the complainant and Appellant. While there was no question that what purported to be—for example—Appellant's blue jeans or the complainant's sweater,

24

the blood evidence had independent significance and required proof that it was in fact on the item at the time it was seized. Thus, while it might not be necessary to prove a chain of custody for the pants themselves, it was necessary to show that they had not been tampered with while in Zain's custody. Without Zain's testimony, the State failed to show that the evidence had not been tampered with.

Officer Guerrero testified that appellant's blue jeans were in substantially the same condition as when he seized them on November 18, 1989. Tom Bevel, the blood spatter expert, found a small blood stain on the right leg below the knee, close to the inside seam. DNA testing by LabCorp revealed the blood to be consistent with Kathie Balonis's DNA and inconsistent with appellant's blood. The stain had never been circled or marked by anyone at BCFSC nor had it been cut from or tested in any way. Bevel noted that the small stain was some distance from the stains on the jeans described by Officer Roque during appellant's videotaped interview on November 17, 1989. Appellant argues that the evidence of the bloodstain found by Bevel was inadmissible because it was not noticed or documented by Roque who was not shown to be a blood detection expert. Further, there is nothing to show that Zain planted the small inconspicuous spot of blood without marking it, testing it, or calling attention to the same, hoping that it might be discovered years later. The trial court did not err in permitting the jury to decide the weight to be given the blood spot involved.

When Tom Bevel examined the physical evidence, he noticed two bloodstains on the turtleneck shirt appellant was wearing on the night in question. One was on the left front near the buttons and the other was on the right shirt sleeve. Bevel photographed both stains before the shirt was sent to LabCorp for analysis. The DNA analysis showed the stain on the shirt's left front was consistent with appellant's DNA. The stain on the right sleeve was consistent with the blood of

25

Kathie Balonis. Neither stain had been tested or cut from by anyone at BCFSC. Bevel concluded that Kathie's blood had been applied to the sleeve by some medium velocity force that forced the blood into the weave of the fabric. Bevel had doubts it had been planted because of the size of the stain and force involved. Here again, Officer Guerrero testified that the shirt was in substantially the same condition as it was when he seized it on November 18, 1989. The fact that the blood stain was not detected until some time later and then by a blood spatter expert goes to the weight the jury may give to it and not to its admissibility into evidence.

Appellant also refers to the bloodstains on a pillowcase. Several individuals who were in the apartment shortly after the killing noticed blood on one of the pillowcases. Photographs and a crime scene videotape reveal a blue pillowcase with two fairly large bloodstains. Both stains were transfer stains from wiping or brushing. LabCorp's DNA testing revealed one of the stains was the blood of appellant. No DNA results were obtained from the other stain.

Two additional but smaller bloodstains were found along the opposite seam of the pillowcase but were not captured by the photographs. Both of these stains were consistent with appellant's DNA. One was caused by a blood drip and the other was impacted into the fabric. Officer Guerrero testified that the pillowcase with the blood stains was in the same condition as when he took it into custody, before it was given to Fred Zain. The bloody pillow itself was left in the apartment and was later destroyed by the victim's parents, who became distressed when they saw it.

Bevel testified that the two stains not captured in the photographs were probably not planted because it would be illogical to plant appellant's blood on an item that already had his blood

26

on it.  At the first trial, Zain testified that the drip bloodstain on the pillowcase (not visible in the photographs) originated from Kathie Balonis.  This was obviously not true, and it would not make any sense to plant appellant's blood on the pillowcase and then testify it was the victim's.

The record reflects that appellant introduced, without objection, Defense Exhibit 16 which was a photograph of the blue pillowcase with blood stains.  The overruling of an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.  This rule applies whether the evidence was introduced by the State or the defendant.  *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

The trial court did not abuse its discretion in admitting into evidence the items complained-of and the accompanying bloodstains.  The first point of error is without merit for all the reasons stated.

### State's Second Motion in Limine

In his second point of error, appellant asserts that the "trial court erred in granting the State's motion in limine and prohibited appellant evidence concerning the manner in which Fred Zain handled evidence in other cases to show that the State could not properly authenticate the physical evidence presented? [sic]."

Appellant's brief contains no "argument and authorities" for this particular point of error.  We find reference to the subject matter in that portion of the brief entitled "Second Trial Evidence."  No authorities, however, are cited there.  Prior to the voir dire examination of the jury panel, a hearing was conducted on appellant's motion in limine and then on the State's first motion

27

in limine. During this hearing, appellant interjected the State's second motion in limine into the discussion. That motion requested appellant be required to approach the bench before offering any evidence of "other cases" handled by Fred Zain. The trial court granted this second motion in limine. Appellant's counsel sought a clarification of the ruling and was informed that he would have to first approach the bench before he offered the testimony of Janine Arvizu or others about "other cases." The record reflects:

| | |
|---|---|
| Mr. Schneider [defense counsel]: | And so before -- before I rest, then I would have to ask permission to do it. And then, if the Court says no, can I proffer her prior testimony on a bill on what she would testify instead of flying her in from New Mexico to testify? |
| The Court: | Yes, you may. |
| Ms. Tanner [prosecutor]: | Okay, back to the first motion. That kind of took us off to the second. |

In claiming that the trial court erred in granting the motion in limine, appellant overlooks the fact that it is axiomatic that motions in limine do not preserve error, whether the motion is granted or denied. *Wilson v. State*, 7 S.W.2d 136, 144 (Tex. Crim. App. 1999); *Webb v. State*, 760 S.W.2d 263, 275 (Tex. Crim. App. 1988); *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd); *Roise v. State*, 7 S.W.3d 225, 240 (Tex. App.—Austin 1999, pet. ref'd). A ruling on a motion in limine does not purport to be one on the merits but one regarding the administration of the trial. *Harnett*, 38 S.W.3d at 655. A traditional motion in limine is a motion requesting that the opposing party approach the trial court before offering certain types of evidence or otherwise going into particular areas before the jury. *Id*.

It is clear that appellant has not presented error to this Court for review because the trial court granted either one or both of the State's motions. The ruling did not prohibit appellant from offering evidence about "other cases" handled by Zain. It only required that he first approach the bench. The second point of error is overruled.

**Motion to Suppress**

In his third point of error, appellant contends that the "trial court erred in overruling appellant's motion to suppress evidence based on the State's inability to properly authenticate any physical evidence without the testimony of Fred Zain."

Appellant's counsel filed a pretrial motion "to suppress all physical evidence which at any time and which in any way was in the hands of the Bexar County Medical Examiner's Office or Fred Zain. . . . The general basis for this motion is that under the facts of this case, in the absence of evidence of a chain of custody, any [sic] the State cannot authenticate any evidence which was ever in the possession of Fred Zain." Appellant based his suppression motion on the due process and due course of law provisions of the federal and state constitutions. U.S. Const. amend. XIV; Tex. Const. art. I, §§ 13, 19; *see also* Tex. R. Evid. 401, 901. On March 29, 2001, some six months prior to trial, the trial court heard and overruled the motion to suppress.

In appellant's brief under "Second Trial—Suppression Hearing," we find a summary of some of the evidence presented at the pretrial suppression hearing along with references to some trial testimony, which was not before the trial court at the suppression hearing. No arguments or authorities are presented. Mere recitation of facts developed at a suppression hearing without argument or authorities presents nothing for review. Tex. R. App. P. 38.1(h); *Lawton v. State*, 913

29

S.W.2d 542, 554 (Tex. Crim. App. 1995); *Smith v. State*, 907 S.W.2d 522, 531 (Tex. Crim. App. 1995); *Garcia v. State*, 887 S.W.2d 862, 871 (Tex. Crim. App. 1994) (mere conclusory assertions insufficient); *Lockett v. State*, 16 S.W.3d 504, 505 n.2 (Tex. App.—Houston [1st Dist.], pet. ref'd); *Maldonado v. State*, 902 S.W.2d 708, 711 (Tex. App.—El Paso 1995, no pet.). The State also notes that appellant did not brief this issue and it did not specifically respond thereto. The third point of error is overruled. *See Louis v. State*, 61 S.W.3d 593, 598-99 (Tex. App.—Amarillo 2001, pet. ref'd).

## Fourth Point of Error

In his fourth point of error, appellant contends that the "trial court erred in sustaining the State's objection to the testimony of Jeanine [sic] Arvizu regarding the manner in which Fred Zain handled evidence in other cases."

The stated point of error is all that we are offered. There is no reference to a record page number, no further mention of the evidence excluded, or the nature of the objection. No argument is advanced, no authorities cited. *See* Tex. R. App. P. 38.1(h). We find no reference to the "fourth issue or point of error" elsewhere in appellant's brief.

> As the complainant on appeal, an appellant has the burden to inform us of the supposed error and explain why it warrants reversal of the judgment. It is not our obligation to divine or develop issues for him. Nor are we required to blindly peruse a voluminous record to discover evidentiary support for the issues before us.

*Louis*, 61 S.W.3d at 598-99.

30

Issues raised on appeal but not briefed are in effect abandoned. It is not the task of a reviewing court to speculate as the nature of an appellant's legal theory and brief the case for him. *See Alvarado*, 912 S.W.2d at 210. Requiring appellants, even in capital cases, to abide by our published briefing rules and to make reasonable arguments does not offend traditional notions of fair play and substantial justice. *Ladd v. State*, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999). The fourth point of error is overruled.

### The State's Approach

The State observes that the "organization of appellant's brief is somewhat confusing." For that or other reasons, the State ignores and does not respond to the second, third, and fourth points of error as stated. The State speculates that appellant's real complaint in these points of error is that the trial court erred in excluding evidence pertaining to *other* cases handled by Fred Zain. The State then responds with its own interpretation of appellant's brief.

In discussing the State's interpretation, we do not retreat from our disposition of the second, third, and fourth points as advanced by appellant.

> To preserve error in the exclusion of evidence, Rule 103(a)(2) [Tex. R. Evid. 103(a)(2)], like the common law, requires that the substance of the evidence be shown by offer of proof. . . . Texas courts have consistently held that error in the exclusion of evidence may not be urged unless the proponent perfected an offer of proof or bill of exception.

1 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 103.3 (3d ed. 2002); *see also Lane v. State*, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993); *Hitt v. State*, 53 S.W.2d 697, 708-09 (Tex. App.—Austin 2001, pet. ref'd).

Thus, in the absence of a bill of exception or offer of proof, there is no basis for reviewing a contention that the trial court erred in excluding evidence. *See Stewart v. State*, 686 S.W.2d 118, 122 (Tex. Crim. App. 1984). No error is presented when an appellant does not meet his burden of showing the substance of the excluded evidence. *Hitt*, 53 S.W.3d at 709 (citing *Kapuscinski v. State*, 87 S.W.2d 248, 249 (Tex. App.—San Antonio 1994, pet. ref'd)).

Where in this voluminous record was evidence excluded and error properly preserved? In a portion of appellant's brief entitled "Second Trial Evidence," we find that appellant has quoted six pages of a trial colloquy. There is no record page reference. Our own search and the State's brief reveals that this colloquy occurred during the State's case-in-chief while Missy Wolfe, a sergeant investigator for the Texas Attorney General, was still on direct examination. It was apparently during the colloquy that the complained-of ruling was made.

Prior to the second trial, Wolfe had traced and gathered evidence including items handled by Zain and other exhibits that Zain had not handled. She had assisted in securing the services of the blood spatter expert, had forwarded items of evidence to the LabCorp Laboratory in North Carolina for testing or retesting, had been present during some of the testing, and had possession of many of the items of evidence at the time of the trial. During her direct examination, some exhibits were admitted into evidence over objections.

On October 9, 2000, after the jury was excused for the day, a wide-ranging colloquy initiated by appellant ensued without mention of a motion, objection, or stated purpose. Appellant's counsel complained that Zain was unavailable as a witness because of the "Fifth Amendment"; that he needed to show Zain's general methodology, how evidence was handled from 1989 to 1993 in

32

the Bexar County lab; that by bringing Janine Arvizu to testify along with her report he could document Zain's methodology; and that he wanted to cross-examine Wolfe about Zain's methodology, the handling and commingling of evidence, and criticism of what Zain did with evidence. The State objected, pointing out that appellant was free on cross-examination or otherwise to show Zain's misconduct in the instant case (about which there was little dispute), but that appellant should not be permitted to show what Zain did in other cases in Texas or West Virginia or to go into reports about other cases. The objection was sustained.

Appellant's counsel continued to insist that he wanted to establish commingling by showing Zain's practice and procedure "in all cases." Counsel then requested the right to read to the jury Zain's testimony from a prior proceeding where Zain invoked the Fifth Amendment. "And if the Court allows me to do that, that will establish his credibility in front of the jury[7] and why this witness [Missy Wolfe] has -- is concerned about it." The State pointed out that Wolfe's testimony related only to the instant case and that the door had not been opened to evidence concerning other cases. Appellant then argued that "404(b) permitted him to offer 'other conduct on commingling' and Zain's past conduct 'in general.'" The trial court stated: "The ruling will be - - will be limited to this case." It is not clear whether the ruling was limited to the cross-examination of Wolfe or was

---

[7] The trial court later did instruct the jury in its written charge that Zain had invoked his Fifth Amendment right to remain silent in a prior proceeding in the case.

a general one. Counsel continued his remarks to the trial court that Zain's methodology could be shown by what Zain did in other cases. The record reflects:

> And we can do that with one witness -- you have heard the witness -- and one analysis of all the records. And that's irrefutable what Fred Zain had done. And I'm just making the argument, I understand the court's ruling and, as part of my bill I would offer Janine Arvizu's testimony from -- I ask the Court -- I guess now my bill would be her testimony.
>
> The Court: We can include that as part of the record.
>
> Mr. Schneider: -- as what I would want to include before this jury and to use for cross-examination purposes with this -- with this witness [Missy Wolfe].
>
> The Court: The request is denied.

The next day the direct and cross-examination of Wolfe continued without further reference to the subject matter discussed above. Did the trial court err in excluding the evidence given the circumstances and the offer of proof?

Appellant has made no effort on appeal to show that Arvizu's testimony supports the claim the State believes he now advances. Any misconduct on the part of Zain in other cases which indicated that he was also guilty of misconduct in the instant case (mislabeling evidence, perjury, lack of reporting, or reporting without results) is not relevant where the evidence before the jury revealed that he was guilty of that misconduct in the instant case. The State did not rely upon Zain's past testimony or tests. In fact, the State disowned Zain.

Moreover, even if appellant was entitled to show what Zain did in other cases, the offer of proof was not sufficient to establish that. Arvizu's only testimony was at the suppression

34

hearing. She testified that she was a laboratory quality control consultant with Consolidated Technical Services, Inc., of New Mexico; and that she was not in the medical field and was not a DNA analyst or a serologist. There was nothing to show that she had any personal knowledge of any case handled by Zain. Arvizu testified that about two years before the suppression hearing, while in the offices of the Texas Lawyer magazine, she had access to nineteen boxes of records from the Bexar County Medical Examiner's Laboratory produced in a civil suit [unidentified]; that she made "a very short review" of those records and produced a report for appellant's counsel. The report was marked and introduced as exhibit "N" at the suppression hearing. The exhibit is not in the record. The court reporter's notes reflect that exhibit N was "retained by counsel."

Arvizu testified that later in January 2001 she reviewed these same records from a civil suit and other documents for one hundred hours in a law firm in San Antonio. Arvizu admitted that she had never visited the Bexar County laboratory involved and had not talked to its personnel. There is nothing to show that she checked the laboratory records against the records she examined. Arvizu related that she was not specifically looking for evidence of contamination but was trying to get a systematic overview of Zain's work, to get a sense of the nature of his work and the reliability and the validity of his reported results.

Arvizu acknowledged that she reviewed the FBI and Dr. Irving Stone's reports on the Bexar County Laboratory which were critical of Zain's work but agreed that these reports did not show that Zain had planted blood on items in cases either in Texas or West Virginia; these reports showed that there had been retesting on items earlier tested by Zain and generally the same results were obtained, and there was no concrete evidence in the instant case that any of the physical

35

evidence was contaminated. Arvizu's opinion was that Zain routinely reported results that were not scientifically supported; that his career in forensic science "is a compelling story of fraud"; that the "results in this case were susceptible to the same kind of practice."

The admission and exclusion of evidence is committed to the sound discretion of the trial court. Tex. R. Evid. 104; *Foster v. State*, 909 S.W.2d 86, 88 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd); *Easter v. State*, 867 S.W.2d 929, 938-39 (Tex. App.—Waco 1993, pet. ref'd). The determination of whether the evidence is relevant lies within the discretion of the trial court. *Johnson v. State*, 698 S.W.2d 154, 160 (Tex. Crim. App. 1985). Error does not occur unless there is an abuse of discretion by the trial court. *Werner v. State*, 711 S.W.2d 639, 643 (Tex. Crim. App. 1986). That is the standard of review. *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); *Reed v. State*, 59 S.W.3d 278, 280 (Tex. App.—Fort Worth 2001, pet. ref'd). A reviewing court is not to substitute its own perception of relevance when there is a zone of reasonable disagreement. *Roy v. State*, 997 S.W.2d 863, 867 (Tex. App.—Fort Worth 1999, pet. ref'd). The appropriate inquiry is whether the trial court acted without reference to any guiding rules and principles. *McKinney v. State*, 59 S.W.2d 304, 311 (Tex. App.—Fort Worth 2001, pet. ref'd). We conclude that the trial court did not abuse its discretion in excluding the evidence offered by appellant under the circumstances presented.

**Texas Rules of Evidence 403 and 404**

In appellant's brief, there is a discussion entitled "Texas Rules of Evidence 403 and 404" under "Argument and Authorities." It is not a stated issue or point of error. Here, appellant urges that evidence pertaining to Zain's conduct in other cases was admissible under Rules 403 and

36

404(b).  Appellant contends that while Rule 404(b) is most commonly relied upon by the State in introducing extraneous offenses against an accused, it applies equally to extraneous offenses the defense seeks to introduce against another person.  *See Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999); *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998).  Appellant urges that the "application of Rule[s] 403 and 404(b) must be viewed in the context of the ability of an accused to present a defense."  He contends that the evidence he sought to introduce was admissible under the "doctrine of chances."  *See Plante v. State*, 692 S.W.2d 487, 491-92 (Tex. Crim. App. 1985), even though Zain was not a witness, a victim, or a party.

In response, the State argues that if Zain committed misconduct in other cases in Texas or West Virginia, that was not relevant to any material fact in the instant case other than Zain's character.  *See Morrow v. State*, 735 S.W.3d 907, 909 (Tex. App.—Houston [14th Dist.] 1987, no pet.).  Moreover, even if relevant, evidence of other misconduct is not admissible to prove Zain's character in order to show that he acted in conformity therewith in the instant case.  Tex. R. Evid. 404(b).  Of course, wrongs, bad acts, and extraneous offenses may be admissible for a purpose other than character conformity as an exception to Rule 404(b)'s prohibition in order to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id*.  The mere introduction of evidence for a proper purpose other than character conformity does not, by itself, make the evidence admissible.  The wrong, bad act, or extraneous offense must be relevant to a fact of consequence in the case.  *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996); *Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992).

With regard to the "doctrine of chances," the State argues that this doctrine is logically applicable only when "intent" to do a bad act is at issue. *Plante*, 692 S.W.2d at 491-92 n.7. The prosecution contends that Zain's intent to do a bad act in this case—to lie and misrepresent the evidence—was not a contested issue. The State never excused Zain's misconduct in the instant case or contended that there was a mistake or oversight. Since the State did not dispute that Zain had previously lied and misrepresented evidence, the prosecution contends that appellant could have had only one reason for attempting to introduce evidence pertaining to Zain's conduct in other cases: to show that Zain acted in conformity with his bad character in this case which would be improper. Tex. R. Evid. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g).

The State's analysis is persuasive. Even if this were not true, appellant has made no effort to show that the trial court erred in this lengthy trial by excluding the evidence on the basis of Rule 403. This rule provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

In his brief on "Rules 403 and 404," appellant has not pointed out where in the record he sought to introduce the evidence in question on the basis of both Rules 403 and 404(b), where the evidence was excluded, or where he perfected his bill of exception or offer of proof. This briefing is not in compliance with our briefing rules. Tex. R. App. P. 38.1(h). Undoubtedly, appellant relies upon the lengthy colloquy discussed earlier where he mentioned "404(b)" and received: "The ruling

38

will be - - will be limited to this case." If appellant relies upon the same Arvizu bill of exception to preserve error, it is still meritless in this situation. Appellant's "Rules 403 and 404" contention is denied.

## Habit

Here again, under "Argument and Authorities," appellant contends that the "trial court also erred in excluding evidence of Zain's continual mishandling of evidence." Appellant relies upon Texas Rule of Evidence 406 which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Tex. R. Evid. 406.

The State is correct in pointing out that this contention, not tied to any point of error, was not preserved for review. We do not find where any evidence was excluded after being offered on the basis of Rule 406. Appellant does not call our attention to any such ruling or its location in the record or to any objection made. We will not address the contention which is inadequately briefed. Moreover, a legal theory on appeal must comport with a trial objection and adverse ruling in the court below. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). No error is presented.

39

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Justices Kidd, B. A. Smith and Onion[*]

Affirmed

Filed:   August 14, 2003

Do Not Publish

[*]   Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).